**SIERRA CLUB et al.,**
**Plaintiffs-Appellants,**

**v.**

**Rogers C. B. MORTON et al.,**
**Defendants-Appellees,**

**Shell Oil Company et al.,**
**Intervenors-Appellees.**

**No. 74–3092.**

United States Court of Appeals,
Fifth Circuit.

March 27, 1975.

Bruce J. Terris, Helen Cohn Needham, Washington, D. C., John D. Hoffman, San Francisco, Cal., for plaintiffs-appellants.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Irwin L. Shroeder, William M. Cohn, U. S. Dept. of Justice, Washington, D. C., J. Berry St. John, Jr., Gene W. Lafitte, New Orleans, La., Thomas A. Clark, John W. Boult, A. Broaddus Livingston, William M. Register, Jr., Tampa, Fla., Wallace H. Johnson, Asst. Attys.

Gen., Edmund B. Clark, Raymond N. Zagone, Neil T. Proto, Attys., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before GEWIN, BELL and CLARK, Circuit Judges.

CLARK, Circuit Judge:

This case involves yet another clash between a federal agency and environmentalists over a proposed development of the nation's resources. The judicial focus, blurred as usual by the lack of technical and scientific expertise, is upon whether the impact statement compiled during consideration of the federal action satisfies the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4321 et seq.

At issue here is a lease sale by the Department of Interior (Interior) of 147 tracts on the Outer Continental Shelf along the coasts of Mississippi, Alabama and Florida consisting of a band of underwater coastal land lying from the tidal zone to roughly thirty miles off shore, extending from the Mississippi Delta to Tampa Bay and including offshore islands and enclosed bays. This leasing is referred to as the MAFLA sale.[1]

Plaintiffs, who attack Interior's decision to proceed and its predicate environmental impact statement, are national, state and local environmental organizations and certain individuals. This action seeks a declaratory judgment, injunctive relief, and a writ of mandamus to prohibit the sale of oil and gas leases by Interior on the MAFLA sale area. Intervenors are 17 oil companies who, at the December 1973 MAFLA sale, along with several other parties, made bonus bids of more than 1.5 billion dollars for

---

1. The acronym MAFLA is derived from *M*ississippi, *A*labama and *Fl*orida. The estimated reserves to be developed on this sale area are 1.5 to 2.4 billion barrels of oil and 1.8 to 2.9 trillion cubic feet of gas. This would require from 700 to 1,120 wells, from 75 to 125 platforms and from 480 to 800 miles of pipeline. It is estimated that the proposed leases may produce 270,000 to 443,000 barrels of oil and .34 to .52 billion cubic feet of gas per day after development and production stabilizes.

the right to explore for oil and gas on these submerged federal lands.

The sale was made pursuant to the provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1337. Interior's Bureau of Land Management first called for nominations of desired tracts. A draft environmental statement was later issued. After discussions and revisions, the final environmental impact statement (EIS) under attack here was filed with the Council on Environmental Quality (CEQ). The notice of lease offer was then published in the Federal Register and, finally, the leases were awarded between December 27, 1973 and January 18, 1974.

The district court found the EIS to be sufficient under NEPA requirements and the decision to proceed on the basis thereof to be reasonable. We affirm.

On appeal plaintiffs assert that (1) the EIS is inadequate under Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C); (2) Interior failed to fully study, analyze, and evaluate the effects of the leasing program on the environment in violation of Section 102 subsections A, B and D of NEPA and Interior's own regulations; (3) the decision to consummate the sale violated the substantive requirements of NEPA and is arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*; and (4) the decision to leave to adjacent states the responsibility to safeguard the environment from the effects of construction of pipelines and onshore facilities violates the NEPA requirement that federal agencies protect the environment from harmful effects resulting from their actions.

 Under existing jurisprudence, plaintiffs were required to establish by a preponderance of the evidence, rather than by a prima facie showing of deficiencies, that the EIS for MAFLA was inadequate.[2] The additional attack on the Secretary of Interior's decision to proceed with the leasing must be founded on proof that it was arbitrary and capricious. Since the basic legal premises on which the district judge based his determination that the federal agency actions passed muster were correct, plaintiffs must shoulder a more imposing burden in this Court. Having failed to convince the trial court that the EIS was inadequate, the plaintiffs must now demonstrate that the lower court's findings accepting the EIS as adequate and the decision to proceed as permissible were clearly erroneous.

██ Section 102(2) contains the procedural requirements designed to compel all federal agencies contemplating actions having a significant impact on the environment to consider NEPA's substantive policies and goals as enunciated in Section 101.[3] The effectiveness of Section 102(2) depends upon compliance with procedural duties "to the fullest ex-

---

2. Sierra Club v. Callaway, 499 F.2d 982, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc. v. Corps of Engineers* (Tennessee-Tombigbee-Waterway), 492 F.2d 1123, at 1131 (5th Cir. 1974). More than "hindsight and sophisticated editing" is required to carry this burden. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 412 (9th Cir. 1973).

3. Section 101(a) provides:

The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and

maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local government, and other concerned public and private organizations, *to use all practicable means and measures,* including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

*See* Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164, 1174 (6th Cir. 1972).

tent possible," *i.e.*, a compliance, the completeness of which is only limited by the agency's statutory obligations.[4] While no agency may properly adopt a less demanding standard for their effort, judicial review is based on a pragmatic standard. In determining whether an agency has complied with Section 102(2), we are governed by the *rule of reason, i.e.*, we must recognize "on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the act does not intend to impose an impossible standard on the agency."[5] The court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.[6]

## TESTING THE EIS

Plaintifffs submit that the EIS fails to comply with Section 102(2)(C) of the Act[7] since it: does not adequately describe and analyze the present environment of the area; fails to adequately describe and analyze the most significant impacts that will result from the MAF-LA sale; fails to analyze the cumulative effect of oil development in the Gulf of Mexico; and fails to adequately analyze reasonable alternatives to the MAFLA sale.

The purposes of an environmental impact statement are to detail the environmental and economic effects of proposed federal action "to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved,"[8] and to compel the decisionmaker to give serious weight to environmental factors in making discretionary choices.[9] "The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action."[10] To carry out this statutory mandate, every relevant environmental effect of the project must be given appropriate consideration.[11] Section 102(2)(C) seeks these goals by specifically requiring a *detailed* statement.

The purposes served by this "detailed statement" requirement have been suc-

---

4. Iowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849, 851 (8th Cir. 1973); Atlanta Gas Light Co. v. FPC, 476 F.2d 142, 150 (5th Cir. 1973); Environmental Defense Fund v. Corps of Engineers (Gillham Dam), 470 F.2d 289, 296–97 (8th Cir.), cert. denied, 409 U.S. 1972, 93 S.Ct. 675, 34 L.Ed. 661 (1972); Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114–15 (1971).

5. EDF v. Corps of Engineers (Tombigbee), *supra*, 492 F.2d 1123, at 1131. *See also* Carolina Environmental Study Group v. AEC, 510 F.2d 796 (D.C.Cir., 1975). Trout Unlimited v. Morton, 509 F.2d 1276, (9th Cir., 1974).

6. *See* Sierra Club v. Froehlke, 486 F.2d 946, 950 (7th Cir. 1973); EDF v. Corps of Engineers (Gillham Dam), *supra*, 470 F.2d 289 at 295–96; Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra*, 449 F.2d 1109, at 1114–15.

7. Section 102(2)(C) provides:
 Include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

8. EDF v. Corps of Engineers (Tombigbee), *supra*, 492 F.2d 1123, at 1136.

9. Monroe Cty. Conservation Council, Inc. v. Volpe, 472 F.2d 693 (2nd Cir. 1972); *accord,* Committee of Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 783 (1971); National Helium Corp. v. Morton, 455 F.2d 650, 656 (10th Cir. 1971); Calvert Cliffs' Coord. Comm., Inc. v. AEC, *supra*, 449 F.2d 1109, at 1114.

10. Calvert Cliffs' Coordinating Committee, Inc. v. AEC, *supra*, 449 F.2d 1109, at 1122.

11. Save Our Ten Acres v. Kreger, 472 F.2d 463, at 467 (5th Cir. 1973).

cinctly enumerated by the First Circuit in Silva v. Lynn, 482 F.2d 1282, 1284–85 (1st Cir. 1973). The *Silva* court stated:

> The "detailed statement" required by § 4332(2)(C) serves at least three purposes. First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must "explicate fully its course of inquiry, its analysis and its reasoning." . . . Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project. To that end, it "must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise." . . . It cannot be composed of statements "too vague, too general and too conclusory." . . . Finally and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug.

*Id.* (Citations omitted.) Again, the courts have approached their review of claims that congressionally specified detail of environmental effects was lacking in an EIS with a view that Congress did not intend to mandate perfection,[12] or intend "for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." [13]

### Present Environment

■ Plaintiffs contend that a most serious shortfall of the EIS is its lack of necessary baseline environmental studies upon which any reasoned decision on the environmental effect of the proposed sale must be based. Four specific omissions are asserted.

First, the statement does not include sufficient analysis of present air and water quality in the area. For the most part, plaintiffs are correct in this censure. While the statement does include an analysis of the impact of lease operations on water quality it does not describe the present quality of these environmental factors although it does contain a brief discussion of water quality degradation which previously occurred in the Mississippi Sound, Mobile Bay and along the Florida Gulf and of climatological and oceanographic conditions.

Second, the statement fails to assess each ecosystem as to its unique character, productivity, and the manner in which it operates. This attack is hypercritical. The statement discusses significant portions of the biological environment. Descriptions of the communities of Phytoplankton, Zooplankton, Benthic invertebrates and the active swimmers (Nekton) of the Gulf, embracing an analysis of factors affecting the distribution and abundance of Benthos and the location of significant Benthic communities, are included.[14]

Third, the statement does not describe the operation of the Eastern Gulf ecosystem as a whole or the importance of the lease area to this ecosystem as a unit. While the EIS does contain general information about life in the Gulf there is a dearth of information explaining the interrelationship of localized biotic communities. No information is given as to the predicted effect on the whole if some part of the system were to be harmed.

Fourth, detailed geological data is absent from the statement. The statement does include a review of the geological history and present structural composition of the entire Gulf, with special attention to structures within the MAFLA

---

12. *See, e.g.,* EDF v. Corps of Engineers (Gillham Dam), 342 F.Supp. 1211, 1217, aff'd 472 F.2d 289 (8th Cir. 1972).

13. EDF v. Corps of Engineers (Tombigbee), *supra,* 492 F.2d 1123, at 1136.

14. Because of a realization of its uniqueness, special attention is accorded to the Florida Middle Ground region. The presence of other aquatic preserves unique to Florida is also mentioned.

sale area and a recognition of geologic hazards of MAFLA exploration and production. Additionally the EIS observes that tests necessary to determine shallow hazards, unstable bottom and mud waves are scheduled to be run after the sale,[15] and that prior to approval of a drilling permit, the Geological Survey requires submittal of an operation plan that includes suitable safety procedures necessary to control anticipated hazards.

### Environmental Impact

Section 102(2)(C)(i) and (ii) require that the EIS contain a detailed statement of the environmental impact of the proposed action and any adverse effects which cannot be avoided if such proposed action is taken. Plaintiffs do not argue that defendants have failed to include references to environmental effects. Indeed, the summary of the EIS states:

> All tracts offered pose some degree of pollution risk to the environment and adjacent shoreline. The risk potential is related to adverse effects on the environment and other resource uses which may result principally from accidental or chronic oil spillage.

Rather, plaintiffs urge that the material included is inadequate to permit the proper evaluation of its probability or importance.

 In a panoply of particularized criticism plaintiffs attack omissions and deficiencies in Interior's preliminary studies. While it is true that the pre-EIS research was either inadequate or nonexistent in some specific areas, the significant environmental effects were recognized and presented in the final statement in a way which afforded the decisionmaker an opportunity to properly weigh them. NEPA's procedural requirements do not exist to dictate form but to insure that judgments are no longer based on old values. This EIS clearly brings the significant long-term environmental hazards and detriments to peer status with the present need and economic costs considerations which formerly would have controlled decisionmaking. This being so, under the rule of reason it meets the minimum requirements of Section 102(2)(C)(i) and (ii).

Plaintiffs further assert that the EIS inadequately analyzes the effect of oil spills which carry a strong probability of reaching shore or other important natural resources. Here the attack is not upon the effect of omitting relevant material, but rather the manner of its inclusion. This EIS developed a matrix analysis for each tract in the proposed sale. The matrix is designed to predict the possible adverse impacts from structures and oil spillage based upon the tract's distance from shore or another valuable resource.[16] In addition to the predicted development structures, an assumed oil

15. The statement provides that high-resolution geophysical data covering all tracts to be offered for sale will be purchased and analyzed by government geophysical personnel and that this data will be available prior to sale to support both pre- and post-sale lease management activities.

16. A sample matrix for one tract looks like this:

| SIGNIFICANT RESOURCE FACTORS | IMPACT FACTORS | | | | | |
|---|---|---|---|---|---|---|
| | Structures | | | Oil Spills (1000 bbl+) | | |
| | IM | PR | F(ST) | IM | PR | F(OS) |
| Natural Resource Systems: | | | | | | |
| Refuges/Management Areas | 20 | 0.0 | 0 | 100 | 0.5 | 50 |
| Unique & Highly Productive Areas | 20 | 0.0 | 0 | 100 | 0.1 | 10 |
| Biota Seaward of Estuary/Marsh/Nursery Areas | 0 | 1.0 | 0 | 40 | 1.0 | 40 |
| Beaches | 40 | 0.0 | 0 | 80 | 0.5 | 40 |
| Coastal Activities/Multiple Uses: | | | | | | |
| Shipping | 80 | 1.0 | 80* | 20 | 1.0 | 20 |
| Outdoor Recreation | 40 | 0.0 | 0 | 80 | 0.5 | 40 |
| Commercial Fishing | 80 | 1.0 | 80 | 80 | 1.0 | 80 |
| Sport Fishing | 0 | 1.0 | 0 | 80 | 1.0 | 80 |
| Ordnance Disposal Area | 100 | 0.0 | 0 | 0 | 0.0 | 0 |

*Tract is partially within 2 shipping lanes

spill in each tract is analyzed on the basis of its potential magnitude and persistence and the tract's proximity to high value resources (wildlife refuges and management areas, unique and highly productive areas, biota seaward of estuary/nursery areas, and beaches) and coastal activities (shipping, recreation, commercial fishing, sport fishing and ordinance disposal areas). A series of scales was devised that would yield a range of values designed to integrate the importance and proximity of each impact-producing factor.[17] A relative environmental factor of 50 or more requires careful scrutiny, and, depending upon the significance and character of the resource that may be affected, the decisional spectrum concerning that tract's inclusion can reach from withdrawing the entire tract, to offering the tract with special stipulations, to merely proceeding with the lease sale. A factor greater than zero but less than 50 predicts that the tract could be developed safely within existing standard practices and operating regulations without significant damage to the resource involved.

Plaintiffs contend that this matrix analysis is insufficient since the values assigned are arbitrary, that it is falsely assumed that all oil spills will be cleaned up within a few days and that the proximity values do not consider the possibility of oil spills which do not occur at drilling platforms. Plaintiffs point to the CEQ's report on continental shelf development off the Atlantic Coast and in the Gulf of Alaska as employing a more satisfactory method of projecting the likelihood of oil spills reaching shore. This CEQ report included specific calculations as to 23 different possible oil spill sites, stating the probability of spills reaching shore at different times of the year.

Interior's decision to project possible environmental damage from all tracts by the matrix approach, as opposed to the use of a more detailed analysis for a few select sensitive points, certainly does not evince a lack of good faith effort to afford the decisionmaker with the necessary quantitative information concerning the potential impact of oil spillage. Because no exact data exists until a spill occurs at a given location, any analysis of future oil spillage involves a degree of speculation. Therefore, every attempt to select quantitative values will be to some extent arbitrary. The use of relative proximity and importance scales to project adverse environmental impacts from all tracts is no more arbitrary than CEQ's selection for analysis of 23 specific points out of the vast Atlantic Coast and Gulf of Alaska area they analyzed.[18]

As to oil spill cleanup procedures, the statement indicates that through joint efforts the lessees hope to perfect an ability to begin oil spill cleanup operations within 12 hours at any point in the MAFLA area. In fact, a stipulation to this effect was included in each lease. However, post-statement developments indicate that a rigid 12-hour requirement for all points within the MAFLA sale area may be unrealistic. While this indicates the necessity for Interior to consider cleanup alternatives and further preventative measures, it cannot retroactively affect the sufficiency of the EIS.

Oil spills from locations outside tracts, while not dealt with by the matrices, are considered and discussed elsewhere in the statement.

Next it is asserted that the statement inadequately assessed the hazards of leasing those 81 tracts which lie in mili-

17. The importance scale ranges from 0 (no adverse effect) to 100 (complete destruction), while the proximity scale ranges from 0.0 (a tract beyond 10 miles) to 1.0 (a tract containing a valuable resource). The resulting environmental impact factor is a number derived by multiplying importance (IM) by proximity (PR).

18. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), which involved the sale of oil and gas leases on some 80 tracts of submerged lands, primarily off eastern Louisiana, referred without criticism, to that impact statement's use of a matrix system very similar to the one utilized in this case.

tary warning areas.[19] However, after coordination and consultation with the Department of Defense, 36 of the originally proposed 195 tracts were withdrawn, and after the draft environmental statement was prepared 12 more tracts were deleted. Additionally, the Secretary of Defense determined that military operations in all non-defense areas would result in only moderate hazard, or no hazard at all, to any possible oil development in the area.

A probability analysis of potential hazards from military operations in the remaining tracts was not prepared until after submission of the EIS. Plaintiffs contend that this procedure fails to satisfy NEPA because the analysis was not included with the impact statement[20] nor was it subjected to the necessary comment and review procedures outlined by Section 102(2)(C) of NEPA.[21] The statement did, however, note that this analysis had been requested and would be sent to the Secretary of Interior immediately upon receipt so that it could be considered in making a final determination on whether to lease the 35 tracts that might involve hazards. This procedure brought the information to the decisionmaker before he acted and also alerted other interested parties to the existence of the hazard. Given the specialized nature of the information, the unique expertise of the governmental agency involved, and the immediate need for the project to proceed, this course of action was not unacceptable.

Plaintiffs further complain that the statement fails to analyze the hazards relating to the 6 tracts which are located in salvo areas. While such military use will be discontinued prior to oil development, plaintiffs argue that the danger from previously dropped ordinance should have been analyzed. The statement did point out that the probability of accidental detonation was low since lease developers must determine bottom conditions before proceeding. The presence of any unexploded ordinance or sunken vessels is detectable through magnetometer surveys, by divers, or through the use of magnetic detection devices. The most important factor here is that the possible danger is stated and EIS readers have the benefit of the analysis of the Department of Defense to alert them to any possible conflict.

Although recognizing that the EIS includes a general discussion of the environmental problems that would result from pipeline construction, plaintiffs complain of the absence of analysis of the effects of pipeline location and construction and the impact of pipeline leakage on particular areas. While the EIS does not include an analysis of these matters, it does include a look at long-term effects of pipeline construction generally, mitigating measures that may be employed to prevent harm from such construction, and a special lease stipulation that reserves the right to require pipelines to be placed in designated areas or corridors. On leases in areas at depths above 200 feet, the pipelines of common carriers must be buried and only 18 of the 147 tracts lie partially or wholly beyond the 200 foot contour. This procedure is expected to minimize the adverse effects from these lines.

The EIS also reviews the effects in previous Gulf operations of gas leaks, oil spills and other pipeline accidents. It further suggests that if it is determined that official establishment of pipeline corridors will constitute a major federal action requiring preparation of an impact statement, then such will be prepared. Plaintiffs read this suggestion as an attempt to fragment the project, and, by gaining acceptance of some

---

19. These areas are used for such activities as testing guns, rockets, bombs, guided munitions, and other arms and conducting gunnery practice, electronic counter-measure activities, and acoustic and electronic-mine neutralizing operations.

20. Sierra Club v. Froehlke, 359 F.Supp. 1289, 1341 (S.D.Tex.1973), rev'd on other grounds, 499 F.2d 982 (5th Cir. 1974).

21. Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 170, 172 (D.D.C.1972).

parts, compel acceptance of the whole.[22] We do not agree that this is the thrust of Interior's proposal. This project is an easily divisible one. In this continuously controllable project, the fact that a tract may prove productive would not mandate that an unsound method of delivering that production be utilized. We are not unmindful of the rule that the sufficiency of an EIS must be determined without reference to *possible* future action. Today's statement, however, includes sufficient pre-statement analysis of possible environmental hazards from pipeline location, construction or leakage.

 The MAFLA sale is said to violate NEPA because it places the entire responsibility on the states to prevent environmental injury from construction of pipelines and onshore facilities. We are in accord with the district court's finding that "an examination of the [EIS] and the supplemental documents reveals that while the states have a role to play in the planning of pipelines and onshore facilities, the federal agency has considered, and will continue to consider, these features." The fact that the MAFLA leases contain a stipulation that pipelines be placed in corridors selected by the federal government gives the government a great deal of control over placement of pipelines and, consequently, over onshore facilities. Thus, Interior retains the opportunity to select less environmentally hazardous areas whenever some harm becomes possible. Their lease controls give them even greater supervisory powers. Additionally, the states of Mississippi, Alabama and Florida have been consulted on several occasions and encouraged to begin planning environmental safeguards for the construction and operation of onshore pipelines and facilities. These states have been forewarned by the EIS of the possible harm that may result from unrestricted construction and operation. Such efforts do not indicate any abdication of responsibility in violation of Interior's NEPA obligations, rather they evince the agency's fulfillment of NEPA requirements that the impact statement be subjected to "the comments and views of the appropriate . . . State, and local agencies . . .,"[23] and that the Federal Government "make available to States . . . advice and information useful in restoring, maintaining, and enhancing the quality of the environment."[24]

 An environmental statement "should disclose the history of success and failure of similar projects."[25] This requirement is also satisfied in the EIS now on review. Plaintiffs complain that the destruction caused to the Louisiana marshlands as a result of the construction associated with offshore development in the Western Gulf should have been analyzed. The statement acknowledges that such environmental harm has been suffered in Louisiana, but attributes the damage to construction of rig-access canals which will not be required for the present sale. Plaintiffs' contention that pipeline construction was also a significant contribution to the damage is precisely the sort of particularized controversy NEPA intended for an EIS to evoke. Its reasonable resolution by an informed decisionmaker is what the Act intended.

### Cumulative Effect

 CEQ guidelines,[26] Interior regulations,[27] Bureau of Land Management regulations,[28] and prior court decisions[29] all require that federal agencies consider the cumulative effect of similar actions

**22.** This practice was rejected in San Antonio Conservation Soc'y v. Texas Highway Dep't, 446 F.2d 1013, 1023–24 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972).

**23.** Section 102(2)(C).

**24.** Section 102(2)(F).

**25.** Natural Resources Defense Council, Inc. v. Grant, 355 F.Supp. 280 (E.D.N.C.1973).

**26.** 40 C.F.R. 1500 6(a).

**27.** 36 Fed.Reg. 19343.

**28.** 37 Fed.Reg. 15018.

**29.** *E. g.*, Scientists' Institute for Public Information, Inc. v. AEC, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1086–87 (1973); Jones v. Lynn, 477 F.2d 885, 891 (1st Cir. 1973).

in making determinations under Section 102(2)(C). Plaintiffs assert that the EIS fails to analyze the cumulative effect of the MAFLA development on the Eastern Gulf. More particularly, they object to the lack of analysis of the cumulative effects of oil spillage from platforms or pipelines, the disposal of muds and oil spills and flushings resulting from increased tanker and barge traffic.

While the EIS does not analyze these factors, it does acknowledge that the increased number of platforms in the Gulf represents a potential increase in possible interference with shipping. It also approximates the number of additional platforms that will be needed, and notes that these platforms will cause spillage. The EIS estimates the annual spillage expected to result from tanker and barge accidents and operations. It specifically points out that the long-term effects of oil spillage from production in the entire Gulf are not clearly understood and that the cumulative effect of more structures and pipelines in the Gulf must be considered.

Sierra Club contends that the statement should have totalled the amount of oil spills which have already occurred from all oil drilling in the Gulf and determined from these figures how much more was probable. It further asserts that similar calculations should have been made for other pollutants, and that the statement should have included a mathematical analysis of the probability of collision and loss of land from pipelines being placed in marsh areas. These contentions boil down to questioning the degree of detail rather than the lack of it. While agreeing that these additional facts may have been useful to the Secretary in reaching a decision, we still conclude that the detail presented was sufficient to uphold the EIS.

## Alternatives

Section 102(2)(C)(iii) of the Act requires environmental statements to present the alternatives to the proposed action. This discussion-of-alternatives requirement is intended to provide evidence that those charged with making the decision have actually considered other methods of attaining the desired goal, and to permit those removed from the decisionmaking process to evaluate and balance the factors on their own.[30] A thorough consideration of all appropriate methods of accomplishing the aim of the proposed action is expected.[31]

Interior devoted a 352-page volume solely to an analysis of alternatives.[32] Plaintiffs have enumerated still other alternatives which they assert were more feasible but which received little or no attention.

Plaintiffs are critical of the statement's failure to discuss federal exploration. We reject this criticism. The court below correctly observed: "[t]he short answer to plaintiffs' argument is that federal exploration is not an alternative *to* the project, but merely another means of proceeding *with* the project so that the environmental consequences should be substantially the same in either case." We agree that federal exploration would present substantially the same environmental hazards as permitting private developers to explore the tracts sold. An alternative which would result in similar or greater harm need not be discussed. Plaintiffs' rejoinder to this response is that the separation of exploration from production is of great environmental importance since information gained from exploration might result in modification or cancellation of the sale. The rejoinder remains unpersuasive since the continuing control which

**30.** Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra*, 449 F.2d 1109, at 1114; Trout Unlimited v. Morton, *supra*, 509 F.2d at 1282, (9th Cir., 1974).

**31.** EDF v. Corps of Engineers (Tombigbee), *supra*, 492 F.2d 1123, at 1135.

**32.** Alternatives considered were: (1) modify the sale; (2) withdraw the sale with needed energy to be replaced by (a) conservation, (b) conventional oil and gas supplies, (c) coal, (d) synthetic sources of gas and oil, (e) hydroelectric power, (f) nuclear power, (g) energy imports, (h) other energy sources, (i) combination of alternatives; or (3) delay the sale until new technology is developed and/or until pending environmental studies are completed.

leasehold restrictions provide, gives Interior an equivalent right to prevent and control ecological detriment.

We also note that plaintiffs did not object to Interior's failure to consider federal exploration at any time prior to the final statement, nor did they adduce evidence that federal exploration would significantly decrease the possibility of environmental hazards.[33] While we would not be understood as holding that every alternative which an opponent fails to mention before an EIS is finalized is waived, plaintiffs' actions here are worthy of note in adjudging the statement's adequacy as against the contention that federal exploration was of such significance that the statement is faulty because it was not considered.

Plaintiffs contend that the EIS' rejection of the possibility of delay of the sale as an alternative was a "pro forma ritual,"[34] which failed to comply with the requirement of NEPA that the environmental statement give "information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned."[35] Plaintiffs' characterizations are inapt. The EIS discusses the feasibility of delay: (1) until new technology is available to provide increased environmental protection, (2) pending completion of studies of potential environmental impacts, (3) pending development of land-use and growth plans onshore or (4) pending completed implementation of recommendations made in reports on outer continental shelf operating orders and regulations and amendment as necessary. These alternatives having been fairly presented, the choice was the Secretary of Interior's.

Should the statement have explored the feasibility of selling additional tracts off the coasts of Louisiana and Texas prior to the MAFLA sale? Plaintiffs suggest that this alternative would have the advantage of securing much needed petroleum production while permitting basic underlying environmental studies of the MAFLA area to be completed prior to sale. The fact that these tracts are in the Western Gulf where production is presently taking place does not indicate that development of the additional tracts there would incur less hazards than development of the MAFLA tracts in the Eastern Gulf.[36] Again, alternatives of equal hazard need not be considered.[37]

Another "alternative" inadequacy is alleged to exist as to deletion of high hazard tracts. However, the statement points out that tracts identified by matrix analysis to have the highest relative potential of environmental risk could be deleted. It further calls to mind that while any such deletion would correspondingly reduce the potential overall environmental hazard of the proposed action, the sale would suffer a concomitant loss in estimated recoverable reserves of oil and gas which would have to be made up from another source. While this tract-deletion approach is somewhat generalized, it is detailed enough to satisfy the Congressional mandate that alternatives be considered.

■ In sum, we conclude that the statement did not lack that detailed

33. One of their attorneys did talk with Interior officials prior to trial concerning whether the feasibility of federal exploration had been considered.

34. Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra*, 449 F.2d 1109, at 1128.

35. NRDC v. Morton, *supra*, 458 F.2d 827, at 836.

36. Plaintiffs offered no evidence concerning the relative possibilities.

37. The frontier area of the Eastern Gulf also was chosen for exploration with the hope of insuring that Outer Continental Shelf production is maintained at least at its present rate. Interior contends that lead time is essential to the Department for a full evaluation of frontier area and for lessees to explore and begin production in such areas if these areas are to be producing at the time other areas have begun to pass their peak production. The commencement of such a new cycle is said to be essential to the future maintenance of a domestic fossil fuel supply. Interior maintains that the MAFLA area is a reasonable frontier for the next exploration since it is adjacent to the existing area and thus facilitates the interchange of personnel, equipment and facilities.

statement of alternatives to the MAFLA sale which NEPA requires.

## Cost-benefit Analysis

Section 102(2)(C)(iv) of the Act requires an analysis of "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." The question this appeal urges is how specifically must this relationship be quantified, i. e., must a dollar and cent weighing of the costs and benefits of the proposed sale be set out in the EIS?

"NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula."[38] Nevertheless, "an agency [must] search out, develop and follow procedures reasonably calculated to bring environmental factors to peer status with dollars and technology in their decisionmaking."[39] We note that regulations promulgated by Interior[40] and by the Bureau of Land Management[41] require quantification of costs and benefits where possible. However, every attempt to assign a dollar value to future effects of present actions necessarily involves prediction. Such opinion estimates can be most precise when the systems involved are simple. As they become more complex and interactive, the ability to forecast becomes more a guess and less a prediction.

▮▮▮▮ The MAFLA development is in the complex, interactive category. The decisionmaker's task nevertheless remains the same. · It is not to total up dollars and cents in a sort of profit-loss ledger, but rather to consider the previously unconsidered by giving weight and consideration to the ecological costs to

future generations in deciding whether present economic benefits indicate that the depletion of irreplaceable natural resources should proceed in the manner suggested, or at all. The use of a postulated economic equation to express these values is permissible and in many instances desirable, but it is not a *sine qua non*. The MAFLA statement, by giving the decisionmaker and other readers enough detail concerning all of these costs and benefits to permit reasoned evaluation and decision, meets the Section 102(2)(C)(iv) requirement that long-term environmental costs be weighed against immediate benefits.

## Baseline Studies

Plaintiffs next allege that the defendants' actions violated subsections A, B, and D of Section 102. Subsection A requires an agency to carry out systematic, interdisciplinary studies of the environmental impact which would result from exploration and development. More specifically, plaintiffs contend that defendants failed to satisfy Interior's regulation 43 C.F.R. § 3301.4, which requires evaluation of the potential effect of the leasing program on the total environment, aquatic life, aesthetics, recreation and other resources in the area. However, the EIS does deal specifically with each of these items.

▮▮▮ Plaintiffs contend that Interior's plans to gain more detailed information concerning the hazardous geologic conditions of the ocean floor after the sale do not satisfy the requirement that the statement "must stand the test alone—i. e., in and of itself it must either meet the requirements of NEPA or fail."[42] However, in a project such as this where developers sign leases and conduct sepa-

---

**38.** Sierra Club v. Lynn, 502 F.2d 43, 61 (5th Cir. 1974).

**39.** Subsection 102(2)(B) has been held satisfied by a good faith attempt to weight and weigh ecology along with economics in reaching a decision. EDF v. Corps of Engineers (Tombigbee), *supra,* 492 F.2d 1123, at 1133. *See also,* Trout Unlimited v. Morton, *supra,* 509 F.2d 1276, (9th Cir., 1974).

**40.** 36 Fed.Reg. 19343.

**41.** 37 Fed.Reg. 15018.

**42.** EDF v. Corps of Engineers (Tombigbee), *supra,* 492 F.2d 1123, at 1130, 1136–7, note 23.

rable operations over a period of months and years, and where restrictions in those leases give the agency the ability to constantly control and adjust future action, this continuing control must be considered in determining the reasonableness of the impact statement.[43] The MAFLA sale is a unique form of federal action. It does not involve a single undertaking or a project which becomes a *fait accompli* the day the decision to proceed is made. Because it contemplates numerous, successive lessor-lessee relationships involving activities over many areas and over many years, the agency's continuing opportunity for making informed adjustments has a major effect upon our evaluation of the sufficiency of the materials contained in the EIS itself.

The future ability to control development for ecological reasons is not given judicial recognition in a NEPA evaluation for the first time here. In Gulf Oil Corp. v. Morton, 493 F.2d 141, 144 (9th Cir. 1973), the Ninth Circuit held that the Outer Continental Shelf Lands Act[44] and NEPA[45] authorize "the Secretary [of Interior] to suspend operations under existing leases whenever he determines that the risk to the marine environment outweighs the immediate national interest in exploring and drilling for oil and gas." More specifically, the court held that the Secretary could properly suspend offshore oil and gas leases for a period sufficient to permit Congress to consider termination of those leases for environmental reasons. This Circuit, in Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 577 (5th Cir. 1974), has cited Gulf Oil Corp. v. Morton for the proposition that "temporary administrative action to meet previously

unconsidered environmental dangers may be appropriate if it furthers the public policy expressed by Congress in the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4321 et seq., even if it involves a temporary cessation of a project previously approved by Congress." Here, the right to exercise future control is directly contractual and even broader than the right which was judicially declared there.

▉ Plaintiffs urge that no deference be given to stipulations, regulations and orders because the EIS fails to point out that they contain no provision for inspection of pipelines, that since 1971 there has been a jurisdictional dispute between the Geological Survey and Interior's Office of Pipeline Safety concerning who would monitor offshore pipelines, and that the result has been an absence of monitoring functions by either agency. Secondly, they point out that the stipulation requiring onsite cleanup equipment within 12 hours has not been placed in the order concerned with control and removal of discharged oil, and in fact, has been recognized by agency officials to be "arbitrary and impracticable." These are classic examples of errors and confusion which future controls can best eliminate. Surely every EIS should strive for perfection, but the realist would not fail to recognize that it seldom results. What we hold today is that where shortcomings in a major federal action can be corrected or minimized when and if they surface, the EIS upon which such action is authorized may meet NEPA's objectives with some less detail and analysis than would otherwise be required.

---

**43.** Additionally, Interior regulations governing oil and gas lease operations in the Gulf of Mexico (30 C.F.R. §§ 250.1 through 250.100), and related Orders and Leasing Regulations (43 C.F.R. §§ 3100.03 through 3130.4–5) should be considered in concert with the impact statement itself since these regulations and orders must be complied with by the lessee *throughout the life of the lease* just as fully as lease stipulations. Noncompliance

with such restrictions, based upon known rather than predicted facts, can result in forfeiture of the lessee's rights and thus foreclose any further activity within that tract until those requirements are satisfied.

**44.** Section 5(a)(1), 43 U.S.C. § 1334(a)(1).

**45.** Section 102, 42 U.S.C. § 4332.

## DECISION TO PROCEED

Supplementary to their assertions of statement inadequacy plaintiffs attack the Secretary of Interior's decision to proceed with the sale. In view of our determination that the procedural requirements of Section 102 were satisfied, we look to see whether the secretary's decision, based upon the information contained in the EIS, was arbitrary, capricious or an abuse of discretion. However, our review does not include consideration of the merits of the actual decision to go forward with the sale. "[I]t is the court's function to insure that the mandate of the statute has been carried out and that all relevant environmental effects of the project [are] given appropriate consideration by the [secretary]."[46] NEPA intended that courts and federal agencies collaborate to insure attainment of the Act's goals,[47] not that a court substitute its discretion for that of the executive as the decision-maker.[48]

This court may reject the secretary's substantive decision only if it was reached procedurally without a full, good faith, individualized consideration and balancing of environmental factors; or if, according to the standards set forth in Sections 101(b) and 102(1) of NEPA, it is "[shown that] 'the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental value.' "[49] The decision to proceed in this instance was not shown to be in clear disregard of the evidence contained in the EIS, nor does it appear arbitrary, capricious or an abuse of discretion.

The judgment appealed from is
Affirmed.

---

**46.** Save Our Ten Acres v. Kreger, *supra,* 472 F.2d 463, at 467.

**47.** NRDC, Inc. v. Morton, *supra,* 458 F.2d 827 at 838.

**48.** Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

**49.** Sierra Club v. Froehlke, *supra,* 486 F.2d 946 at 952. *See also* Save Our Ten Acres v.

Kreger, *supra,* 472 F.2d 463 at 466; Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1281 (9th Cir. 1973); EDF v. Corps of Engineers (Gillham Dam), *supra,* 470 F.2d 289 at 300; Calvert Cliffs' Coordinating Comm., Inc. v. AEC, *supra,* 449 F.2d 1109, at 1115; *accord.*