MONROE COUNTY CONSERVATION COUNCIL, INC., and Ray Huther, on his own behalf and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

Brock ADAMS, Individually and as Secretary of the United States Department of Transportation, Defendant-Appellee.

No. 289, Docket 77–6129.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1977.
Decided Nov. 22, 1977.

Wayne M. Harris, Rochester, N. Y. (Harris, Maloney, Horwitz & Evans, Rochester, N. Y.), for plaintiffs-appellants.

Eva R. Datz, U. S. Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Richard J. Arcara, U. S. Atty., Gerald J. Houlihan, Asst. U. S. Atty., Rochester, N. Y., Jacques B. Gelin, U. S. Dept. of Justice, Washington, D. C.), for defendant-appellee.

Before LUMBARD, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Because its streets had not been designed to handle the mass movement of motorized vehicles, Rochester, N. Y., like many other older cities, was ill-prepared for the advent of the automobile. More than thirty years ago, State, County and City officials set out to create a system of arterial expressways to solve, in part at least, the serious traffic problem existing in the City and its adjoining towns. Their efforts culminated in a plan for an "inner" expressway loop around the downtown Rochester area and an "outer" loop around the City's perimeter. Construction of the inner loop has been completed. We are concerned on this appeal with the State's efforts to complete the outer loop.[1]

This loop, as it presently exists, encircles the City on the east, north and west sides and the easterly portion of the south side.[2] There is, however, a four-mile gap in the westerly portion of the south side. Athwart this gap sits an 842 acre public park known as Genesee Valley Park. In 1967, the New York State Department of Public Works sought the approval of the United States Bureau of Public Roads (now the Federal Highway Administration) for construction of a roadway viaduct over a portion of this park. Approval was granted in 1968. In 1970, the State submitted additional documentation for purposes of compliance with § 4(f) of the United States Department of Transportation Act of 1966 as amended. 49 U.S.C. § 1653(f).[3] This submission was approved by the Secretary of Transportation on May 7, 1971.

However, the enactment of NEPA, the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, and the subsequent prosecution of this suit by the Monroe County Conservation Council, Inc. resulted in a judicial roadblock to the completion of the highway. In 1972, on a prior appeal by the Conservation Council, this Court held that, although the project had been almost completed, the State had to comply with the provisions of NEPA for the unfinished portion, including the preparation of an Environmental Impact Statement (EIS) as required by 42 U.S.C. § 4332. *See Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 (2d Cir. 1972). We held also that, up to that point, there had been inadequate compliance with § 4(f). The Secretary of Transportation was enjoined from approving funding of the unfinished segment until the statutory requirements had been met.

1. The complete traffic plan also contemplates expressways running to the north and to the south from the outer loop, but they are not involved in this proceeding.

2. Compass directions have been simplified for purposes of this opinion.

3. Section 4(f), so far as pertinent, forbids the Secretary of Transportation from approving any project requiring the use of publicly owned park land unless there is no feasible and prudent alternative to such use and the program includes all possible planning to minimize harm to the park. Similar provisions are contained in section 138 of the Federal-Aid Highway Act, 23 U.S.C. § 138.

Five years have now passed. Public hearings have been held, and comments have been solicited from appropriate public and private agencies. A 395 page EIS, with a 331 page Appendix, and a revised 81 page 4(f) Statement have been prepared and filed. The approval of the Secretary of Transportation has been obtained once more. A motion to vacate the prior injunctive order was granted in the United States District Court for the Western District of New York on findings that the requirements of that order had been met, and plaintiffs bring the matter before this Court once again.[4]

Plaintiffs advance two principal contentions on this appeal: (1) that inadequate consideration was given to alternatives to the proposed construction, 42 U.S.C. § 4332(2)(C)(iii) and 49 U.S.C. § 1653(f); and (2) that inadequate consideration was given to its social impact, 42 U.S.C. § 4332(2)(C)(i) and 23 C.F.R. 771.18(*i*)(2)(iii). We have made a careful review of the record and summarize below the facts which are pertinent to these contentions. Before doing so, however, we define briefly the role which a district court plays in cases of this nature.

■ With regard to the EIS, the task of the district court "is merely 'to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.'" *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977) (quoting *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975)).

In making such a determination a court is governed by the "rule of reason", under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the deci-

sion-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*County of Suffolk v. Secretary of the Interior, supra* at 1375 (citations omitted).

■ Insofar as the 4(f) Statement is concerned, the district court must ascertain first whether the Secretary of Transportation acted within the scope of his authority, *i.e.*, whether the Secretary could have reasonably believed that there were no feasible alternatives to the use of parklands or that the alternatives involved unique problems. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court, without substituting its own judgment for that of the agency, must then determine that the choice made was not arbitrary, capricious, an abuse of discretion or a violation of law. *Id.* Finally, the court must satisfy itself that the correct procedures have been followed in arriving at the decision under review. *Id.* at 417, 91 S.Ct. 814.

■ The burden of proof is on the challenging plaintiff to establish that the EIS was inadequate or that the Secretary of Transportation had acted improperly in approving the use of parklands. *Sierra Club v. Morton, supra*, 510 F.2d at 818; *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir. 1974).

### The Alternatives

Genesee Valley Park is an 842-acre peninsula projecting from the southwest perimeter of Rochester into the neighboring towns. It lies in the flood basin of the Genesee River and extends southwesterly along the river for approximately three miles. Immediately north and northwest of the park is the Monroe County Airport, which is in the town of Gates. Between the

---

**4.** The district court's order was made conditional upon the United States Coast Guard's grant of permission for bridge construction as required by 33 U.S.C. § 401. Applications for

construction permits had been filed fourteen months before the district court hearing, and permission was granted shortly thereafter.

airport and the park is Scottsville Road, which runs parallel to the river. To the south and east are the towns of Brighton and Henrietta. Residential Rochester is primarily to the northeast, and the park is bordered on the northeast side by Elmwood Avenue, which begins at the end of Scottsville Road at the northwest corner of the park and runs generally east.

The Barge Canal runs generally east and west through the town of Brighton, cuts through the park near its northeast end, and then swings to the north along the City's western boundary. The western portion of the outer loop, constructed between 1963 and 1965, runs parallel to the canal between the airport and the City and ends at Scottsville Road near the canal bridge. The proposed highway will follow the path of the canal from Scottsville Road through the park on an elevated viaduct. Thereafter it will continue by surface route for about a mile to the east. After that it will swing slightly north across the canal and connect with the western end of the existing southerly segment of the loop. The viaduct through the park, of spanned concrete construction, will be approximately 2100 feet in length, including a 430-foot river span, and will be on the south side of the canal.

As set forth in detail in the EIS and the 4(f) Statement, the Department of Transportation considered thirteen alternatives to the recommended construction, five of which did not make use of parklands and eight of which did. The first, of course, was the "do-nothing" alternative. This alternative, taking into account the possible benefits of projected mass transportation improvements, was felt not to be a viable one. The population of the town of Brighton in 1975 was 38,500. It is estimated that this will increase to 49,500 by 1995. Henrietta's 1975 population was 47,000, and this is expected to increase to 101,000. If the loop were not completed, traffic congestion in these towns would increase—on some roads as much as 150%. Extensive reconstruction of local roadways would be required, with minimum beneficial results. In the words of the EIS, "the alternative of doing nothing does nothing to solve existing, let alone future, traffic problems in Brighton and Henrietta."

Closely akin to the do-nothing alternative, and unsatisfactory for many of the same reasons, was the possibility of continuing the southern segment of the loop only a short distance to the west, stopping at a point where a proposed southern expressway (the Genesee Expressway) is intended to intersect the outer loop. From that point, a connection would be made with several existing streets running to downtown Rochester. It was concluded that this also would do little to relieve the traffic congestion which completion of the outer loop was intended to eliminate. According to the EIS, this alternative "is comparable to the 'Do Nothing' alternative with respect to providing traffic relief on major arterials west of the proposed Genesee Expressway."

A third alternative envisioned completing the loop with a highway which avoided the park by circling to the north through the City. This would require cutting through extensive residential areas on both sides of the Genesee River, as well as the campus of the University of Rochester and the Mt. Hope Cemetery. The EIS concludes that "[t]he displacement and disruption potentially rendered by such an alternative would be so great as to be unthinkable and totally unacceptable." It points out that every governmental and civic group which has studied location alternatives has reached the same conclusion.

In the fourth and fifth alternatives, the expressway would detour to the southwest around the park and would then proceed north along the west side of the airport. Under one proposal, the expressway would connect directly with the outer loop about one mile north of the airport. Under the other, it would connect with Chili Avenue, an existing east-west highway which runs north of the airport and intersects the outer loop. Each would bypass that portion of the completed loop running along the east side of the airport. The first proposed route would cost 43 million dollars more

than the recommended route through the park and would be 5.75 miles longer. The second would cost 28 million more and would be 4.7 miles longer. Having in mind the purpose of the outer loop to move traffic expeditiously around the City and to provide traffic relief for the towns of Brighton and Henrietta, the Department of Transportation concluded that the fourth and fifth alternatives, swinging so far out of the intended line of travel, were feasible but not prudent.[5]

All of the remaining alternatives required some use of the park. Alternative number six contemplated the reconstruction of Scottsville Road, Elmwood Avenue and two other existing streets into a 100-foot wide expressway which would encircle the park at its northern end. At least forty homes would have to be removed to accomplish this. The highway, which is expected to carry more than forty thousand vehicles a day, would go directly past Strong Memorial Hospital, which is on Elmwood Avenue, just east of the park. Although only a small portion of the park would have to be taken to accomplish this reconstruction, the actual "use" of the park, within the meaning of § 4(f) would be much greater. The park, like the hospital and nearby homes, would be subject to the unpleasantness which accompanies the heavy flow of surface traffic. In addition, access to the park from the adjoining residential areas would become difficult and hazardous because of the necessity of crossing a heavily-travelled, six-lane arterial highway. These factors add up to a "use" of the park under the statute. *See Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir. 1972); *Conservation Society v. Secretary of Transportation*, 362 F.Supp. 627, 638–39 (D.Vt.1973), *aff'd*, 508 F.2d 927 (2d Cir. 1974). The DOT concluded that a highway in this location would be incompatible with adjacent land uses, "residential, park and quasi-public institution," and described it as a possible but poor alternative.

The seventh alternative contemplated a viaduct through the park directly along the banks of the canal, with the west-bound and east-bound roadways located north and south of the canal respectively. The impact of this construction would be similar to that of the recommended route. However, it would affect both banks of the canal, whereas the proposed construction is confined to the south side. It would thus prevent completion of the park segment of a hiking and bicycling trailway along the north bank of the canal which is included in the proposed plan.

The eighth possibility called for the loop to intersect the park in a north-south direction. The expressway would run partly at grade and partly by viaduct. It would require the redesign of two golf courses, would utilize the greatest amount of park land and would cause the greatest long term change to existing facilities. It was therefore deemed a less desirable choice.

The ninth and tenth alternatives considered the construction of a tunnel along the recommended east-west route through the park, one of cut-and-cover construction and the other of driven construction. The eleventh and twelfth alternatives contemplated both types of tunnel construction along the north-south route through the park. The cut-and-cover tunnel along the east-west route would be approximately 4,300 feet long and would cost 76 million dollars, or 56 million dollars more than the recommended viaduct.[6] The driven tunnel along this route would be approximately 5,500 feet long and would also cost about 76 million dollars. The cut-and-cover tunnel

---

5. The EIS points out that in a study done by the Rochester Committee for Scientific Information, the conclusion was reached that a southern route around the park would be so long and circuitous that it would not be utilized by motorists.

6. The appendix to the EIS contains an 80-page Tunnel Cost Study prepared under the guidance of James Washington, tunnel specialist for the Federal Highway Administration. The cost estimates contained therein are predicated upon a 1973 construction contract date. They also assume the absolute optimum of subsurface conditions. The report points out that, if unfavorable conditions are encountered, tunneling costs could increase "three-fold".

along the north-south route would be approximately 3,560 feet long and would cost 63 million dollars, or 39 million dollars more than similarly aligned surface construction. The driven north-south tunnel would be approximately 4,900 feet long and would cost 67 million dollars, or 43 million dollars more than the surface construction. The annual maintenance cost for a tunnel, nearly one-half million dollars, would be substantially higher than for the recommended viaduct. Although other disadvantages associated with the construction and use of tunnels are discussed at length in the EIS and 4(f) Statement, they were considered to be feasible alternatives to the recommended viaduct construction. However, for obvious reasons, they were not deemed to be prudent ones.

A thirteenth alternative, which was suggested by the Environmental Protection Agency, was "chunneling"—submerging prefabricated tunnel sections into the canal so that the tunnel could run along the canal bottom. It was determined that it would be physically impossible to place a chunnel section, 100 feet wide and 20 feet high, in a canal which was only 75 feet wide and 12 feet deep.

 We are satisfied that the foregoing constitutes a reasonably comprehensive selection of alternatives, made in good faith. We find no merit, therefore, in appellants' contention that the Department of Transportation "selected alternative routes and designs which, no one could argue otherwise, were infeasible and not prudent." Undoubtedly, innumerable additional variations of routes and designs could have been considered and analyzed. However, the De-

partment of Transportation was not "obligated 'to consider in detail each and every conceivable variation of the alternatives stated'; it 'need only set forth those alternatives "sufficient[ly] to permit a reasoned choice".'" *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 400 (4th Cir. 1977) (quoting *Brooks v. Coleman,* 518 F.2d 17, 19 (9th Cir. 1975)); *see also Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). We conclude that the district court did not err in finding that the EIS provided adequate consideration of alternatives and that the alternatives to use of park land were analyzed in the 4(f) Statement and shown to be either not feasible or not prudent.[7]

### The Social Impact

 A substantial portion of the EIS has been devoted to the probable significant social impact of the proposed construction. *see* 23 C.F.R. § 771.18(*i*)(2)(iii); and the conclusion reached was that it will have none.

For those dependent upon public transportation, the EIS points out that the project is not intended to supplant existing or proposed transit systems but to complement them. Bus turnouts and park-and-ride facilities are included in the loop design, and utilization of the loop for express bus service has been recommended in the Rochester Metropolitan Transportation Study. Non-drivers, who use public transportation, will not be adversely affected by the construction.

---

**7.** Appellants urge that the district court failed to undertake the "searching and careful" inquiry into the facts demanded by *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The district judge adopted the government's proposed findings of fact and conclusions of law in their entirety, omitting the formality of retyping, on the day following oral argument, during the course of which he indicated that he had not yet read the voluminous documents upon which his decision hinged. Nothing we have said about the limited scope of review applica-

ble to environmental impact statements should be read to detract from *Overton Park's* admonition, nor to imply approval of what appears to be a cursory treatment of the issues in this case. However, this Court, which is in "as good a position as the district court to determine on the undisputed facts what could reasonably be demanded of the EIS in issue", *County of Suffolk v. Secretary of the Interior, supra* at 1375, has made a thorough, in-depth review of the record and finds nothing to indicate that the district court erred in its determination.

According to the EIS, the project causes no displacement of residential, commercial or industrial land uses. Most of the land east of the park is already publicly owned and has been reserved for use in the contemplated construction. The remainder is farmland. There is expected to be little recognizable impact on home building, property values or governmental services. No neighborhood blight will follow the construction, nor will any subdivisions be isolated through changes in local access. Completion of the loop is expected to have little effect on governmental institutions, the provision of public services, the resource base of the towns, and amenities of life in general. In sum, according to the EIS, "[n]o major change is foreseen in neighborhood character, cohesiveness and stability, nor are there any known minority groups affected by the project."

The impact of the project on the park is described as minimal. In 1957, when the city made its original decision to run the outer loop through the park, it acquired an additional 27 acres of land as replacement for the land which the loop would occupy. Under the recommended proposal, only 10.7 acres will be required for the viaduct, and 5.3 acres of usable land beneath the viaduct will be returned to park usage. None of the land involved is active recreation area, i. e., golf course, play field or picnic grounds. There are no man-made improvements in the area, which is described as generally wooded with little underbrush. It is now used primarily for do-it-yourself automobile repairs, car washing, strolling, fishing and just sitting. The project contemplates the creation of an under-bridge parking area with an associated access road, together with automobile boat-launching ramps for the canal. Vehicular and pedestrian traffic to and through the park will not be adversely affected, nor will the use of the canal for recreation. Indeed, a recreational trailway along the canal is projected as part of the project. Major steps will be taken to prevent contamination of air and water, to eliminate noise, to maintain the general quality of the environment and to minimize harm to the park. The project as recommended has been approved by the Monroe County Department of Parks. In short, says the EIS, the park will remain available for those who use it now; access to it will remain the same, and residents of the city will suffer no adverse social effects as a result of the proposed construction.

The district court's finding that "[t]he Federal Highway Administration, in conjunction with the New York State Department of Transportation in good faith has taken a hard look at all the environmental consequences associated with the proposal . . . ." is fully supported by the record and is not erroneous.

As stated above, a court, in reviewing an EIS and a 4(f) Statement, is not empowered to make a de novo determination concerning the advisability of the proposed construction. Neither is it permitted to "fly speck" the statements, *Brooks v. Coleman, supra,* 518 F.2d at 19, or to use the applicable statutes as "a crutch for chronic fault-finding", *Life of the Land v. Brinegar, supra,* 485 F.2d at 472. Its duty, instead, is to see that the officials and agencies involved have properly considered the relevant factors and that the administrative decision was not arbitrary, capricious or a clear abuse of discretion. The arguments of appellants' diligent counsel have not demonstrated that the district court erred in its findings and conclusions on these issues.

The judgment appealed from is affirmed.