**FALLS ROAD IMPACT COMMITTEE INC., a non-profit Wisconsin corporation, Plaintiff,**

v.

**Elizabeth M. DOLE, Secretary of the United States Department of Transportation, et al., Defendants.**

**No. 83–C–529.**

United States District Court, E.D. Wisconsin.

March 14, 1984.

Raymond R. Krueger, Charne, Glassner, Tehan, Clancy & Taitelman, Milwaukee, Wis., for plaintiff.

Nathan A. Fishbach, Asst. U.S. Atty., Milwaukee, Wis., for defendants.

Peter A. Peshek, DeWitt, Sundby, Huggett & Schumacher, Madison, Wis., for Village of Grafton.

Richard J. Boyd, Asst. Atty. Gen., Madison, Wis., for State of Wisconsin.

## DECISION AND ORDER

WARREN, District Judge.

This is a suit for injunctive relief which arises out of the proposed construction of the Falls Road bridge and traffic corridor in Grafton, Wisconsin. The plaintiff is a non-profit corporation and consists of 51 members who are residents of the area. The defendants are Elizabeth M. Dole, Secretary of the United States Department of Transportation ("U.S. DOT"); Ray A. Barnhart, Administrator for the Federal Highway Administration ("FHWA"); Frank B. Mayer, Region 5 Administrator for the FHWA; Lowell Jackson, Secretary of the Wisconsin Department of Transportation ("Wis. DOT"); and the Village of Grafton. The plaintiff alleges that the defendants have violated federal law in four ways and that construction of the project should be enjoined until there is compliance with the applicable federal law. Specifically, the plaintiff claims that the defendants have violated: (1) 23 U.S.C. § 138 and 49 U.S.C. § 1653(f), hereinafter referred to as the "Parklands Statute" or "section 4(f)," by failing to make findings under the statute; (2) the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4332(2)(C), by failing to prepare an environmental impact statement for the proposed project; (3) the Federal-Aid Highways Act, 23 U.S.C. § 101 et seq., and NEPA, and the regulations promulgated thereunder, by failing to consider all available alternatives and impacts of the project; and (4) the hearing requirements of the Federal-Aid Highway Act.

The trial of this action commenced on July 18, 1983, and consumed five full days of the court's calendar. During the trial, 27 witnesses were called to testify, the depositions of several others were read into the record and approximately 100 exhibits

were received in evidence. Following the trial, the transcript of the trial was prepared and the parties submitted lengthy proposed findings of fact and conclusions of law as well as post-trial briefs. The Court having considered the evidence and the submissions of the parties, now renders its decision. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this shall constitute the Court's Findings of Fact and Conclusions of Law.

## I. DESCRIPTION OF THE PROJECT

The proposed project involves construction of a new bridge across the Milwaukee River at Falls Road and a connecting corridor in the Village of Grafton. The project as proposed consists of: a new traffic corridor from Highway 57 on the west through a wooded area, sometimes referred to as Scout Park,[1] east to a "Y" intersection with South Green Bay Road which extends south to the entrance of Lime Kiln Park and north to Falls Street; reconstruction of a part of South Green Bay Road; construction of a single span steel girder bridge with a width of thirty-five feet (35') and a length of two hundred feet (200') across the Milwaukee River from South Green Bay Road just north of Vienna Court on the west to Falls Road on the east side of the river; and reconstruction of Falls Road from the river east to 16th Avenue. The total anticipated cost for the project will be in the excess of $1,610,000, of which $1,207,500 will be federally funded under the Federal Aid-Highways Act.

The Village of Grafton is a rapidly growing community located near the Milwaukee metropolitan area. No residences nor businesses will need to be acquired by the Village in order to construct the project. Approximately one acre of land for right of way will need to be acquired. Existing land use west of the Milwaukee River is primarily undeveloped lands with business and commercial development in the vicinity of the west project limits and residential development along South Green Bay Road in the vicinity of the proposed bridge. Existing land use east of the river near the proposed bridge is primarily residential development. In the area where the bridge will cross the river, the setting is still largely natural and aesthetic values are high.

East-west traffic in the Village of Grafton is presently served by two existing bridges over the Milwaukee River, located on Washington Street (STH 57) and Bridge Street. Washington Street in Grafton serves as a primary artery for the Village and is fed by other arteries including STH 60, STH 57, CTH O and CTH Q. The Washington Street bridge serves as the primary crossing, has no weight restrictions, handled approximately 13,800 vehicles per day in 1980 and is approximately 60 years old. The Bridge Street bridge is a one-lane bridge with capacity restricted to three tons, which handled approximately 1,710 vehicles per day in 1980. It is approximately 90 years old and has undergone extensive repairs and reconstruction in the past. The closest river crossing to the south of Grafton is approximately two miles south of the Washington Street Bridge on CTH T. To the north, the closest Milwaukee River crossing is in the Village of Saukville on STH 33, approximately four miles north of the Washington Street Bridge.

The proposed Falls Road bridge and corridor will serve as an alternative east-west route for pedestrian and vehicular traffic in the Village of Grafton. The new bridge and corridor will ease traffic congestion on the two existing river crossings while providing better east-west access for local and emergency traffic. The proposed corridor will serve to improve the means of transportation for emergency and public services such as ambulance, fire protection, police protection and school busing. The proposed project will help the business community in the area by providing improved ac-

---

1. Whether "Scout Park" is indeed a "park" is a major issue in the case. The defendants agreed, however, for convenience, to refer to the wood-ed area as Scout Park. The Court has done so throughout this opinion.

cess to principal highways for business related traffic. After the new corridor is constructed, it is also expected that it will become an important transportation route for commercial and industrial employee and customer access, and products distribution.

## II. HISTORY OF THE PROJECT

Since 1961, the Village of Grafton has considered the necessity for and alternative locations for a third bridge which would cross the Milwaukee River in Grafton.

Between 1965 and 1973, the Village prepared four reports addressing the need for an additional bridge and considering possible locations for such a bridge. First, in 1965, the Village prepared a Master Plan; this Master Plan evaluated three alternative locations for the bridge (one of which was the Falls Road site). The Master Plan recommended that all three sites should be considered for future crossings. Second, in 1967, the Village commissioned an engineering study which concluded that it would be feasible to construct a third bridge at Falls Road. Third, in 1971, the Village authorized a feasibility study for a Cedar Street bridge as an alternative to a Falls Road bridge. Fourth, in 1973, the Village commissioned another engineering study to examine the feasibility of constructing a third bridge in Grafton; this study recommended that the third bridge should be constructed at the Falls Road site.

On October 7, 1977, the Village Board formed a "Special Bridge Study Committee" to examine the feasibility of constructing a third bridge. On March 20, 1978, this Committee recommended that a new bridge should be constructed at the Falls Road location. The study noted that the Falls Road site was the only location for a bridge which might qualify for federal funding and which would not require the dislocation of people or buildings. The study noted that the Falls Road site would require a minimum of land acquisition. On April 3, 1978, the Village Board unanimously accepted the study's recommendation.

On May 15, 1978, the Village held a Public Information Meeting at the Village Hall to discuss the proposed Falls Road Bridge and to receive public input.

On July 21, 1978, the Village requested that engineering firms submit proposals for the design of a bridge at Falls Road. On October 2, 1978, the Village Board hired the engineering firm of Donohue and Associates to design a bridge at the Falls Road site.

On July 16, 1979, the Village held a Public Information Meeting to discuss preliminary design concepts and to receive public input.

On March 5, 1979, officials of Grafton and Wis. DOT met to discuss the proposed project. On May 17, 1979, Wis. DOT approved Grafton's request for engineering services from Wis. DOT for the project, including the review of all plans and environmental reports for the project. On August 6, 1979, Wis. DOT approved a Concept Definition Report for the project. On October 31, 1979, officials of Grafton, Wis. DOT and FHWA met in Grafton to conduct a field review of the site and discuss the type of environmental document appropriate for the project. At the meeting, the officials agreed that the environmental screening worksheets would discuss various alternative locations and recommend that Falls Road be the approved location. An FHWA official at this meeting stated that the environmental documents should discuss secondary impacts of the project including the fact that traffic patterns in the Village would change as a result of the construction of this project.

On May 8, 1980, the Village forwarded a Draft Negative Declaration and a Noise Report covering the project to Wis. DOT. The Draft Negative Declaration concluded that the project would not have a significant effect upon the environment.

On June 26, 1980, Wis. DOT approved the Draft Negative Declaration and forwarded the Draft Negative Declaration and Noise Report to the FHWA for review. On July 8, 1980, the FHWA concurred in Wis. DOT's determination that this project

would not have a significant effect on the quality of the human environment. On the same date, the FHWA approved the Noise Report contained in the Draft Negative Declaration and concluded that it satisfied the requirements of the FHWA regulations.

On October 6, 1980, the Village of Grafton conducted a public hearing to discuss the proposed Falls Road bridge. Prior to this hearing, the Village published two public notices of the hearing. The notices indicated the following:

(1) That the hearing would consider the location, design, and environmental aspects of the proposed project;

(2) That prior to the hearing, there would be an opportunity for informal discussion of the proposed project with project engineers;

(3) That information concerning the proposed project was available for inspection and copying at the Village Hall and that a map of the proposed project would be available for the public hearing;

(4) That a draft report of the proposed project's environmental impacts and effects was available for inspection and copying at the Village Hall; and

(5) That written comments regarding the proposed project could be submitted at the public hearing or to the Wisconsin Department of Transportation or the Village for a two week period after the hearing.

At the commencement of the October 6, 1980, public hearing, it was announced that:

The objective of this hearing is to give you a full opportunity to express your opinions about the location, design, [and] the environmental aspects of this project.

The public hearing lasted over two hours. At least 89 people attended the hearing. At least 26 people registered to speak at the hearing; a lawyer representing a citizen's group was present. A five minute time limit was imposed on each speaker. A 17-page handout which described the proposed project was provided to each individual who attended the hearing, although one page was missing from the handout. A written transcript of the proceedings of the public hearing of October 6, 1980, was produced and became part of the federal record used for the agency decisions pursuant to the National Environmental Policy Act and the Federal-Aid Highways Act.

After the hearing, officials from Wis. DOT and FHWA were critical of the way in which the hearing was handled, citing, among other things, the missing page in the handout and the five minute limitation on presentations. Nevertheless, Wis. DOT decided that the deficiencies were not sufficient to invalidate the hearing and specifically found that a rehearing was not necessary. (Ex. 18.)

Subsequent to the hearing, many citizens of Grafton sent letters regarding the proposed project to the Village or to the Wis. DOT. Questions which were raised by citizens at the public hearing or by letter subsequent to the hearing were analyzed and answered as part of the environmental documents provided by the Village of Grafton to Wis. DOT and to the FHWA.

Although a transcript of the hearing, the citizens' letters and the responses by the Village were all incorporated into the environmental record of this project, the only specific change to the proposed project after the October 1980 hearing was a revised noise analysis. This was completed on April 14, 1981, and used a different methodology than had been used in the original noise analysis conducted by the Wis. DOT in 1980. The 1980 Noise Report used the L10 method, while the revised report used the L equivalent or LEQ method. Use of the new method resulted in a decrease in projected noise levels.

On June 2, 1981, Wis. DOT concluded that this project would have no significant impact on the quality of the human environment and provided copies of the revised Environmental Assessment (formerly referred to as the Draft Negative Declaration) to FHWA. On November 6, 1981, FHWA concurred in Wis. DOT's assess-

ment and adopted the revised Environmental Assessment as a Finding of No Significant Impact ("FONSI"). It is uncontested that neither FHWA, Wis. DOT, nor the Village made findings under section 4(f) of the Parkland Statute.

Under the Federal Urban-Aid System, Wis. DOT administers the federal funds made available to local projects which satisfy the requirements of the Federal Urban-Aid System. Wis. DOT then enters into a project agreement with the municipality involved in the local project whereby the parties agree upon the details of funding. The project agreement also vests in the state the power of supervision over the letting and administration of contracts for all work to be performed. In this way, the State of Wisconsin insures that all aspects of the local project meet the requirements of the Federal Urban-Aid Systems. FHWA and U.S. DOT have the responsibility under section 4(f) of the Department of Transportation Act to make a determination as to whether a proposed project will "use" a publicly owned park or recreational area. FHWA and U.S. DOT have the responsibility of determining whether the proposed project will significantly effect the quality of the human environment within the meaning of NEPA. Under the project agreement entered into between Wis. DOT and the Village, the initiation and accomplishment of the project are subject to the applicable Federal Aid-Highway Act and regulations of the FHWA.

## III. THE PARKLANDS STATUTE

The Court now turns to plaintiff's first contention, that the federal defendants violated the law by failing to make findings under section 4(f) of the Parklands Statute. In general, the Parklands Statute provides that no publicly owned park or recreation area may be used for federal highway purposes until the Secretary of Transportation finds that there is no feasible or prudent alternative to the use of such land and that all possible planning to minimize harm to such land has been done.[2] The defendants maintain that no such findings were required here: (1) because the wooded area west of South Green Bay Road, referred to by plaintiff as Scout Park, through which the corridor will pass is not a "park" or "recreation area" within the meaning of the statute and (2) because there will be no actual or constructive use of Lime Kiln Park which lies to the east of South Green Bay Road and which is acknowledged by both sides to be a park within the meaning of the statute.

### A. Standard and Scope of Review

The parties further disagree on the standard of review to be employed by this Court on the Parklands portion of this case. Defendants assert that this Court must employ the three-step analysis enunciated by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That is, the Court must first determine whether the federal defendants acted within the scope of their authority (i.e. did they reasonably believe that a 4(f) statement was not necessary). Second, the Court must determine whether their decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

---

**2.** 23 U.S.C. § 138 provides in relevant part:
After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance, as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program

includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use. In carrying out the national policy declared in this section the Secretary in cooperation with the Secretary of the Interior and appropriate State and local officials, is authorized to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

Third, the Court must determine whether the federal defendants followed the correct procedure in arriving at the decision. *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24; *Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419, 422 (2d Cir.1977); *Brooks v. Volpe*, 380 F.Supp. 1287, 1290–91 (W.D. Wash.1974). Finally, the defendants maintain that "the burden of proof is on the challenging plaintiff to establish that the ... Secretary of Transportation had acted improperly in approving the use of parklands." *Monroe County*, 566 F.2d at 422; *see also Hall County Historical Society v. Georgia Dept. of Transportation*, 447 F.Supp. 741, 750 (N.D.Ga.1978); *Arkansas Community Organization for Reform Now v. Brinegar*, 398 F.Supp. 685 (E.D. Ark.1975), *aff'd sub nom. Arkansas Community Organization for Reform Now v. Coleman*, 531 F.2d 864 (8th Cir.1976).

The plaintiff, on the other hand, argues that the *Overton Park* analysis is inapplicable in a case where no section 4(f) findings have been made. It asserts that the application of the Parklands Statute to the instant factual situation and the determination of whether there will be a "use" of "parklands" is a matter of statutory construction and therefore a question of law for the Court. The plaintiff cites *Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir.1972) in support of its position.

The Court does not find plaintiff's argument particularly persuasive. It is true that in *Overton Park*, unlike the case at bar, there was no dispute that the Parklands Statute applied. The only question there was whether the Secretary had properly found that there were no reasonable and prudent alternative routes and that all possible planning had been done to minimize harm to the parkland. From these facts, plaintiff argues that the "arbitrary and capricious" standard was adopted by

the Supreme Court to review the Secretary's findings, not to review the Secretary's interpretation of the language of the Parklands Statute. The Court is unconvinced, however, that there is any real difference between a situation where the Secretary is called upon to decide whether particular facts fulfill the legal standard "reasonable and prudent alternative" and the situation where the Secretary must determine if particular facts demonstrate that "parkland" is being "used."

While the Court remains unconvinced that *de novo* review is appropriate in the case at bar, it is not necessary to decide the issue. Whether the Court applies the 3-step review process outlined in *Overton Park* with its highly deferential "arbitrary and capricious" standard, or whether it considers the interpretation of "parkland" and "use" to be a question of law susceptible to *de novo* review in light of the facts developed at trial, the Court must still conclude that no section 4(f) findings were required in this case.

This leads the Court to a brief comment on the scope of review utilized in the Parklands portion of this case. The Court believed it was necessary here, as contemplated in *Overton Park*, and in *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1972), to obtain additional explanation of the reasons for the FHWA's decision not to make 4(f) findings in this case. Accordingly, the Court admitted evidence outside the federal record on the Parklands issue.[3] While the Court may have erred on the side of admitting too much additional evidence, especially that proferred by plaintiff, this evidence only reinforces the Court's conclusion that whether an arbitrary and capricious standard of review is applied or whether the Court itself applies the terms "parkland" and "use" to the facts developed at trial, no section 4(f) findings are required.

---

**3.** The defendant Village of Grafton specifically stated that evidence beyond the administrative record was warranted on the question of whether Scout Park is a "park" within the meaning of the statute. *See* July 12, 1983, letter by Attorney Peter Peshek to the Court. The Court believes it is fair to say that the other defendants concurred in this assessment. The defendants did, however, voice objection to some of the evidence beyond the federal record which related to the "use" of Lime Kiln Park.

## B. "Scout Park"

Section 4(f) ... is applicable only if two conditions are satisfied by the land in question: first, ... the land to be used by a project must be publicly owned, and second, the land must be from one of the enumerated types of publicly owned land, *i.e.*, a public park, recreational area, or wildlife and waterfowl refuge.

*National Wildlife Federation v. Coleman*, 529 F.2d 359, 370 (5th Cir.1976). There is no dispute here that the land referred to as "Scout Park" by the plaintiff is publicly owned. The question before the Court is whether the land is a park or recreational area within the meaning of the statute.

■ The Scout Park area was not identified as a park or recreation area in any environmental document which was part of the federal administrative record in this case. (Ex. 1000.) The Draft Negative Declaration which was reviewed by FHWA contains the following language:

### IMPACT ON ENVIRONMENT AND AESTHETICS

As with other alternative bridge sites, some disruption of existing wooded and natural areas along the Milwaukee River are expected in the vicinity of the proposed structure. *Some disruption to natural wooded areas is also expected along the corridor from South Green Bay Road west to the railroad tracks.* The impact in this area is not considered significant because recent sewer construction has already caused considerable disruption. Also, this area is presently zoned "M1, Industrial District" and future industrial expansion is likely. (emphasis added.)

Ex. 1000 at 64.

At trial, the following evidence was introduced. Scout Park is located on South Green Bay Road across from Lime Kiln Park. It is an undeveloped wooded area owned by the Village, bordered on the north by the Village sewage treatment plant and a wooded area, on the west by the Milwaukee Road railroad tracks used several times a day by freight trains, on the southwest by a privately owned dog park located in the Town of Grafton open to the public and known as Muttland Meadows, and on the east and southeast by South Green Bay Road and Lime Kiln Park. The land to the west is utilized for a shopping mall and other retail activities, including a K Mart and a McDonald's Restaurant. The proposed project involves the construction of a new traffic corridor through Scout Park to connect State Highway 57 on the west with the "Y" intersection for South Green Bay Road on the east.

The area known as Scout Park was part of a larger parcel of 12.75 acres purchased by the Village on August 27, 1957, from F. Carl Mintzlaff and Joyce Mintzlaff. The land was originally purchased by the Village for construction of a sewage treatment plant. Shortly thereafter, the Village adopted a resolution naming the area "Mintzlaff Woods" because the parcel had been in the Mintzlaff family for many years and the family had spent considerable money and a large amount of time to beautify the property.

The original sewage treatment plant for the Village of Grafton was built on the northwestern portion of Mintzlaff Woods. Grafton is currently doubling the size of its sewage treatment plant with construction to the south in Scout Park. The area of expansion is located north of the traffic corridor. Future expansion of the sewage treatment plant will be to the south of the current expansion and south of the proposed Falls Road further utilizing the area originally purchased for that purpose in 1957. The current 1983 expansion of the sewage treatment plant was designed to facilitate future expansion in the southern portion of Scout Park. The Environmental Assessment for the expansion of the sewage treatment plant by the United States Environmental Protection Agency dated July 21, 1980, described Scout Park as a wooded lot and did not identify it as a park.

Beyond the undisputed fact that what is now known as Scout Park was purchased as a site for a sewage treatment plant and

has been utilized and will be utilized as such, there is a variety of conflicting evidence on the issue of whether the unused portion of the parcel is a park or recreation area.

On October 30, 1962, the Village Planning Commission stated in its minutes that "work should be started on the development of the dump site—Mintzlaff woods area for recreational purposes." There is no evidence that the Village Board took any immediate action on this proposal. On June 17, 1963, the Village Board decided to proceed with a project in conjunction with the Boy Scouts to clean up Mintzlaff Woods for a park area.

On October 1, 1965, a Master Plan was prepared for the Village of Grafton. Although the Master Plan was never formally adopted by the Village, it has been used by the Village as an aid for planning. The Master Plan depicted the area later known as Scout Park as an existing park, recreation and reserve area.

In 1978, two hand drawn maps were prepared by James W. Thunes who served as an assistant building inspector and health officer for Grafton for approximately nine months. These maps designated the area encompassing Scout Park as a public park. However, Thunes testified that he could not recall who instructed him to prepare the maps nor could he recall what his source of information was. He stated that he assumed it to be the assessor. He further testified that he did not discuss the maps with Marty Marchek, the Village planner. Although one of the Thunes maps was hanging on the wall of the Village Board room just prior to the trial of this action, there was testimony that the map was never used by the Village Planning Commission.

The other Thunes map was provided to the Southeastern Wisconsin Regional Planning Commission (SEWRPC) when SEWRPC was conducting its park and recreation study for Ozaukee County. On February 23, 1978, the Village Administrator, Emory Sacho, requested of SEWRPC that Scout Park be added to the inventory of publicly owned natural areas. Page 119 of the SEWRPC study, entitled "A Park and Recreation Plan for Ozaukee County," (Ex. 883) states:

Open areas with woodlands, wetlands, or wildlife habitat areas which are acquired by public agencies or private organizations to preserve such lands in an essentially open state for conservation and recreation purposes, are termed natural area sites. In the Village of Grafton in 1977, there was one natural area site— Scout Park—totaling seven acres (See Table 36 and Map 67).

However, the Chief Land Use Planner for SEWRPC testified that SEWRPC reports will designate an open area as a primary environmental corridor, even if a village has set aside an area as a future sewage treatment plant site until the plant is constructed without regard for the purpose of the Village in owning the open space land.

There are no printed Village maps prepared by the Village which show Scout Park to be a park. The current official village map, dated May 1981 (Ex. 1010) lists Village parks by name. Exhibit 1010 has no reference to Scout Park but does designate the area as the "Waste Water Treatment Plant."

Prior to 1978, the Scout Park area had been zoned as an industrial use district. Park and recreation use was a permitted use under the industrial use ordinance in effect at the time. In February 1978, the zoning classification for this area was changed to M-1, Industrial District, and this area continued to have this classification up to the date of trial. There is no parkland zoning classification in the Village of Grafton. However, all other city parks are in R1–R5 (residential) areas on Exhibit 1010. Plaintiff did not introduce any evidence to show that the Village of Grafton Board gave "conditional use" approval for a public park in the area zoned M1 in the Scout Park area. Plaintiff did not introduce any evidence that the Village Planning Commission ever considered using Scout Park as a public park pursuant to Sec. 62.23(5), Wis.Stats.

In 1975, a storm sewer was constructed from the sewage treatment plant east to South Green Bay Road and this 1975 construction path is the location for the proposed Falls Road connection between South Green Bay Road and Highway 57. On September 16, 1976, the Village Park and Recreation Commission voted to officially designate Mintzlaff Woods as a public park and name the area Mintzlaff Scout Park. On October 4, 1976, the Village Board voted to approve only part of the recommendation made by the Park and Recreation Commission, i.e. to officially name the area Scout Park. It took no action to officially designate the area as a public park.

There is no wide spread community utilization of Scout Park. Only one school class uses the land for any school purpose. In 1977 the Village Board assisted the development of an Eagle Service Project that was designed to renovate Scout Park for the public and authorized Village employees to use Village equipment to help clean up the area. However, no Boy Scout Troop has used Scout Park since 1979. No Girl Scout Troop has used Scout Park since 1978. The Girl Scout "bible" of area resources has never listed Scout Park as a natural resource area for Girl Scout use. No youth group has used Scout Park since 1979. Prior to March of 1983, plaintiff's botanist was unaware of Scout Park. The Village Park and Recreation budget since 1978 reflects no money having been appropriated for Scout Park. The Village has not spent any money on Scout Park to enhance recreational opportunities except for indirectly assisting the Eagle Service project. There was testimony from several citizens living in the vicinity of Scout Park that they have used the park for various purposes related to the natural and undeveloped state of the park: observing wild flowers, observing the change of seasons, nature walks, viewing wildlife, and watching the development of plants and trees in the park.

Finally, the Village of Grafton President from 1975 to the present testified that he does not consider the land known as Scout Park to be a Village Park. The Village of Grafton official planner testified that he does not consider the land known as Scout Park to be a Village park. And the Donohue and Associates supervisor who managed preparation of the environmental document submitted for the Falls Road bridge and corridor project to the Wisconsin Department of Transportation testified that he did not consider Scout Park to be a park.

Paul Tufts, the staff specialist for the environment for the Wisconsin Division of the Federal Highway Administration, testified that in approving the November 6, 1981, FONSI, he considered whether a 4(f) statement was necessary for the Scout Park area. Tufts testified that a 4(f) statement was not prepared because there was no indication in the record before him that Scout Park was a "park."

Having reviewed the limited evidence contained in the federal administrative record as well as the additional explanatory material presented at trial, the Court does not hesitate to conclude that Scout Park is not a park within the meaning of the Parklands Statute. The Court does so even though it agrees with plaintiff that the legislative history of the Parklands Statute demonstrates that Congress intended the statute to have broad application. However, this Court concludes that even a broad interpretation of "park" or "recreation area" will not allow this Court to deem a tract purchased by a village for the construction of a sewage treatment plant to be parkland.

The evidence clearly shows that the tract was purchased and is being used for a sewage treatment plant. The mere fact that the city fathers at the time of the purchase chose to call the area "Mintzlaff Woods" does not change the fact that the land was intended for industrial purposes.

Similarly, the recommendations of the Planning Commission or the Park and Recreation Commission that an area be developed as or designated as a park, without the action of the Village governing body, seems to the Court to be little more than wishful thinking. The designation of the

area as "park, recreation and reserve area" on the 1965 Master Plan appears to the Court to carry greater weight, even though the plan was never formally adopted by the Village. Nevertheless, as the Village Planner testified at trial, it seems logical to the Court that such a plan diminishes in usefulness over the years. Thus, even if the Village considered the area to be a present or future park site in 1965, such a designation does not seem determinative in 1981, when the federal defendants reviewed this project.

As for the maps prepared by James Thunes, a short-term village employee who could not recall the source of the information included on his map, the Court would feel this evidence is entitled to almost no weight but for the fact that one of the maps was later provided to SEWRPC in connection with its report on parks. Nonetheless, the Court must again conclude, as the SEWRPC representative testified, that the providing of the map and the inclusion of Scout Park in the SEWRPC report signified only that this was an open area until such time as it was put to a more intensive use.

The Court believes that the current official Village map is entitled to more weight than the 1965 Master Plan or 1978 Thunes maps because it is more current and shows zoning restrictions. The Court would also note that since the map was approved in May of 1981, it was not prepared in anticipation of the lawsuit over this project which was not commenced until April 18, 1983. The official Village map shows the area referred to as Scout Park by plaintiffs zoned M–1, Industrial, and labeled Waste Water/Treatment Plant Site. This is in sharp contrast to all of the parks shown on the official map which are zoned residential.

Finally, although the plaintiffs produced several scout leaders who testified to occasionally using Scout Park for nature study with their troops, there was insufficient evidence to conclude that such activity has been anything but sporadic and infrequent. Likewise, the Court recognizes that various

neighbors might enjoy walking through the wooded areas of Scout Park, but the Court does not find this sufficient evidence to support a finding of a park or recreation area within the meaning of the statute.

Thus, based on all of the foregoing evidence, the Court concludes that there was no common law nor statutory dedication of the Scout Park area as a park. Accordingly, the Court finds that the defendants did not violate the Parklands Statute in declining to prepare a 4(f) statement regarding the Scout Park area.

### C.  Lime Kiln Park

In contrast to the Scout Park area, the parties agree that Lime Kiln Park is a public park within the meaning of the Parklands Statute. The dispute on Lime Kiln Park centers on whether there will be a "use" of the park—either actual or constructive—which would invoke the application of the statute and require section 4(f) findings.

The administrative record and the evidence at trial establish the following regarding Lime Kiln Park.

It is a publicly owned park located between South Green Bay Road and the Milwaukee River. The park is located adjacent to the Milwaukee River and contains horseshoe pits, picnic grounds and a children's playground. The park is naturally divided between an upper portion and lower portion. The upper portion of the park is dominated by man-made features like the children's play area, horseshoe pits, picnic grounds, cut grass and limited planted trees. The lower portion of the park adjoins the river, is in a more natural setting and is used for camping and similar activities. The children's play equipment is located on the upper portion of the park between 40 to 60 feet from South Green Bay Road. There are no barriers between the play equipment and the roadway. The playground equipment is used on a regular basis by children in the Village, especially during special events held in the park. Lime Kiln Park also contains an exercise trail, part of which is composed of a jogger's path and the other part of which

consists of several exercise stations. A number of these exercise stations border South Green Bay Road. The jogger's path comes within approximately 40 feet of South Green Bay Road.

### 1. Actual Use

■ Looking at the case law regarding the actual use of parkland, it is clear that an actual physical taking of parkland, no matter how minor, would be a "use" invoking application of the Parklands Statute. In *Township of Springfield v. Lewis*, 702 F.2d 426, 430 (3rd Cir.1983), the court stated that *"Any park use, regardless of its degree invokes § 4(f)."* (emphasis in original) In *Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79, 84 (5th Cir.1976), the court stated:

> However, the court's strict definition of § 4(f) prudence was not limited to factual situations involving severe takings or destruction of parkland. Rather, the spirit of *Overton Park* is clearly to the effect that the statute is to be read broadly to protect greenlands. Neither did *Overton Park* enunciate any sort of substantial taking threshold for the applicability of § 4(f). The statute explicitly states that it is applicable whenever parkland will be "used for a highway project."
>
> This thumb-on-the-scale approach is required whenever parkland is to be used. If courts were to interpret this section to permit an initial appraisal of whether the use was substantial, it would infuse consideration of elements (such as the degree of harm to the park, animal life, environment, etc.) which Congress did not want considered when it said, if there is another way, take it. Any park use, regardless of its degree, invokes § 4(f).

Plaintiff alleges that there will be an actual taking of approximately 15 square feet of parkland where the project corridor is integrated with the park's driveway. This contention is based on the deposition testimony, admitted at trial, of Richard LeMahieu, an engineer for Donohue & Associates who is participating in preparing the engineering plans for the project. On April 15, 1983, the preliminary design plans (Ex. 145) were prepared and called for the use of approximately 15 square feet at the entrance to Lime Kiln Park for the project corridor.

However, as defendants are quick to point out, these design drawings were not before Paul Tufts of FHWA on November 6, 1981, when he approved the FONSI. Furthermore, the April 1983 plans are not the final plans. Engineer Jerome Smith of Wis. DOT testified that the taking of Lime Kiln Park as shown in the preliminary plans is not necessary. Furthermore, Wis. DOT and FHWA testified that the final plans for the project would not be approved if there was a taking of Lime Kiln Park because this would be contrary to the environmental assessment, the concept definition report and design study for the project.

Jerome Smith of Wis. DOT testified at 5 T 37: [4]

> Q Well, my question is, can the consultant reject your suggestion? [In Ex. 1105 to change the Lime Kiln Park Entrance design.]
>
> A Well, it's his plan, so he can do what he would want, but I would not be able to approve it [Ex.145] in the form that this is.
>
> Q Can the project be built if it doesn't get your approval?
>
> A My superior would not sign the plan.
>
> Q If your superior does not sign the plan, would the project be built?
>
> A No.

Paul Tufts of FHWA gave similar testimony at 5 T 150–51:

> Q Now, Mr. Tufts, you've been present during most of this trial, and you recall that Exhibit 145 was admitted, which I think was described as design plans for this project. Have you ever seen these design plans?

---

**4.** Citations to portions of the transcript are to volume and page. Thus, 5 T 37 is volume 5, page 37.

A  No, sir, I have not.

Q  In what stage of the process would you see the design plans, 145?

A  Usually about eight weeks before we would be asked to approve those plans.

Q  Now, under the policies of the Federal Highway Administration, are you required to look at these design plans prior to approving the Fonzie?

A  No, we are not.

Q  Are you required to look at these plans prior to considering whether 4F is needed or not?

A  No, we are not.

Q  If at some future date prior to the time a project is approved, you look at these plans, and you determine that land is indeed being taken from Lime-Kiln Park, what, if anything, would you do?

A  At that point there has to be a decision made. If land would have to be taken, a 4F statement would have to be prepared or the plans would have to be changed such that there was no taking from the park or Federal funds could not participate in the project.

Q  You indicated—

THE COURT: When you made your determination that there was no necessity for a 4F statement because there was not taking, what were you operating on as your source of information?

THE WITNESS: It would be in the environmental assessment, Fonzie, and the proposed work to be done for that project. The designer sometimes changes things at will, and this is why we'd have to review the final plans.

The Court believes the record is perfectly clear that when the federal defendants did their last review of the environmental documents, there was no indication that there would be an actual taking of parkland requiring a section 4(f) statement. Similarly, the Court does not doubt the representatives of Wis. DOT and FHWA when they say that the final plans will be carefully scrutinized and will not be approved (or a 4(f) statement will be completed) if there will be an actual taking. Accordingly, the Court finds no violation of the Parklands Statute in FHWA's decision not to make 4(f) findings based on an actual use of Lime Kiln Park.

2.  Constructive Use of Lime Kiln Park

Plaintiff also argues that there will be a "constructive" use of Lime Kiln Park because the project will result in increased traffic on South Green Bay Road which will be accompanied by additional noise, access and safety problems, and an adverse impact on the aesthetics of the park. In *Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir.1972), the Court stated that, "The word 'use' is to be construed broadly in favor of environmental statements in cases in which environmental impact appears to be a substantial question." In *Monroe County Conservation Council, Inc. v. Adams*, 566 F.2d 419, 424 (2d Cir.1977), the Court found a constructive use under the following circumstances:

> The park, like the hospital and nearby homes, would be subject to the unpleasantness which accompanies the heavy flow of surface traffic [more than forty thousand vehicles per day]. In addition, access to the park from the adjoining residential areas would become difficult and hazardous because of the necessity of crossing a heavily-travelled, six-lane arterial highway. These factors add up to a "use" of the park under the statute.

In *Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269, 1280 (D.C.Arizona 1973), the Court held that a proposed freeway immediately adjacent to a park was enough to require a 4(f) statement.

Turning to the facts presented at trial, the Court would first note the testimony of Paul Tufts, staff specialist for the environment for the Wisconsin Division of FHWA, who made the FONSI in this case. Tufts testified that he considered whether a 4(f) statement was required for the project and concluded that it was not. Specifically with regard to Lime Kiln, there was the following exchange:

Q And you earlier indicated that you believed there was no constructive use for Lime-Kiln Park?

A That's correct.

Q And could you define for the Court what constructive use is, at least your concept of constructive use?

A Constructive use would tend to be where an impact would be so substantial that it would significantly affect the park.

Q Why do you believe there would be no constructive use of Lime-Kiln Park by the project?

A Well, in analyzing the various aspects of the project on that area, I found no substantial impacts to the park area.

5 T 151–52. Tufts then went on to explain that he did not believe that the noise from increased traffic would be a significant factor based on his review of the revised Noise Summary Chart contained in the Revised Environmental Assessment Report (Ex. 37—also found at page 310 of Ex. 1000, the Federal Record). The revised Noise Summary Chart projects increases in the noise level of South Green Bay Road of 6.5 to 7.5 decibels over existing noise levels. Tufts testified that he did not find such an increase to be significant.

Tufts was also asked whether he considered whether the increased traffic would constitute a constructive use of Lime Kiln Park.

A I feel that the traffic would not constitute a constructive use of Lime-Kiln Park.

Q And what is the basis for the opinion?

A My basis for that opinion would be that you have the existing road there, and we are not widening that road at all. You would have a few more cars on the road, but we're also improving access to the park and safety by putting sidewalks down Green Bay Road to the park.

Q What would be the effect of sidewalks in terms of the use of Lime-Kiln Park, if you have an opinion.

A Yes, I have an opinion. I feel it should help the use of the park. Today people using the park have to walk in the road. If there were sidewalks, they would be on the sidewalks, and maybe more importantly, I would say bicycles, the modern 10-speed bicycles with its thin tire usually can't ride on gravel; and therefore, on roads without shoulders, they are not on the paved section. And if we had a sidewalk, the bicycles could utilize the sidewalks; and therefore, it would have no conflict with traffic whatsoever.

5 T 157.

In addition to the testimony by this agency official, additional background information presented at trial included the following. In 1980 the average daily traffic was 1,200 for South Green Bay Road. On June 19, 1979, Wis. DOT estimated 4,500 ADT in the year after construction (1981); 7,600 ADT ten years after construction (1991); and 11,200 ADT twenty years after construction (2001). In these projections, Wis. DOT estimated that 7.5 percent of the vehicle traffic using the project would consist of trucks. In April of 1983, Wis. DOT issued revised traffic projections of 2,800 to 3,000 ADT in the year after construction and 4,200 to 4,500 ADT twenty years after construction. The Court concludes on the basis of all the testimony that the 1983 projections are the more accurate. Plaintiff's traffic expert, Dr. William Berg, acknowledged that the original 1979 estimates "may in fact be quite high." 3 T 40. Defendant's highway and traffic expert, Paul Box, also acknowledged the 1979 estimates to be too high, 4 T 149–51, as did a Wis. DOT engineer, Neil Weisner, who has approximately 12 years experience in traffic projections 5 T 87–97.

There is disagreement between the parties on an issue related to future traffic increases, i.e. the question of whether the Chateau Drive Railroad crossing southwest

of Lime Kiln Park will be closed. It is clear that should the crossing be closed, it would result in an approximately fourfold increase in traffic on South Green Bay Road adjacent to Lime Kiln Park. Plaintiff maintains that an aerial map in the Draft Negative Declaration and page 7 of the project statement (Ex. 128) which was distributed at the public hearing demonstrate that the Village plans to close the Chateau Drive crossing. However, Paul Box, defendants' traffic expert, testified that he has recommended to Village officials that the crossing remain open.

Based upon the April 1983 traffic projections and assuming that the Chateau Drive crossing will be closed, plaintiff's traffic expert, Dr. Berg, projected the noise level for the children's play area in Lime Kiln Park as 65.5 decibels. The design noise level for the park is 67 decibels. A design noise level for a particular classification of human activity is the upper level of acceptable noise.

The plans for the proposed Falls Road bridge and corridor project call for sidewalks and curbs throughout the length of the project to enhance safety. Pedestrians and bicyclists must currently use the roadway to reach Lime Kiln Park because there are no sidewalks along South Green Bay Road.

Construction of the Falls Road Bridge and Corridor project will take approximately 80 to 100 working days. During this construction period, Lime Kiln Park will not be closed to vehicular or pedestrian traffic, although access will be primarily from the south.

Various residents of the area testified that they believed the aesthetics of the Lime Kiln Park area would be adversely affected.

■ Having reviewed the evidence developed at trial, the Court must determine whether a "constructive use" of Lime Kiln Park has been established. The Court would first note that it cannot agree with the position espoused by plaintiff in its post-trial reply brief at page 13 that the impacts on Parkland need not be "substantial" in order to constitute a constructive use. The Court acknowledges that, under *Overton Park*, if there is an actual physical taking of parkland, there is no need to establish that it is substantial in order to invoke the statute. But the Court believes the very case law cited by the plaintiff on the meaning of "constructive use" forces a different conclusion when no actual taking is involved.

The court in *Brooks v. Volpe* referred to a situation where the environmental impact appeared to be substantial. *Monroe County* found a constructive use where a six-lane arterial highway carrying approximately 40,000 cars per day adjoined a park. In *Citizens for Mass Transit Against Freeways* the constructive use involved an immediately adjacent freeway. These cases demonstrate quite graphically that the effects of a transportation project on nearby parkland must be substantial in order to constitute a constructive use.

■ Turning to the facts of this case, the Court concludes that there is no constructive use of Lime Kiln Park by the Falls Road bridge and corridor project. Plaintiff argues that the increased traffic volumes will increase noise and safety hazards to the point of a constructive taking. But the revised noise projections show that noise will increase only 6.5–7.5 on South Green Bay Road. The plaintiff's own expert testified that the projected noise level in the park would be 65.5 decibels. This is 1.5 decibels below the design noise level of 67 for an area of active use. While this level does "approach" the design noise level, as plaintiff argues, the Court cannot conclude that this is significant enough to constitute a constructive taking. On the safety question, plaintiff simply asserts that increased traffic means increased risk to pedestrians and bicyclists, especially children. But the Court finds defendants' assertion that the addition of sidewalks will actually improve the safety of those walking or bicycling to the park to make eminent good sense.

As for restricted access during construction, the Court cannot find that a limitation in the direction from which the park can be approached for a period of 80 to 100 days amounts to a taking or use of the park. The public will still be able to use the park. As for adverse impact on the aesthetic value of the park, plaintiff points to little hard evidence beyond the fact of increased traffic. Having concluded that the noise level from the traffic will not exceed design levels, the Court does not see how the traffic alone will be a significant impact on aesthetics. Plaintiff asserts that trees and vegetation will be destroyed, but the Court finds no evidence of this as relating to Lime Kiln Park in the record. The Court does not find a constructive use based on loss of aesthetic value.

Based on the foregoing, the Court concludes that there will be no constructive use of Lime Kiln Park within the meaning of the Parklands Statute. Accordingly, the federal defendants did not violate the Parklands Statute when they made no section 4(f) findings regarding Lime Kiln Park.

Based on all of the foregoing, the Court finds that there was no violation of the Parklands Statute, 49 U.S.C. § 303 and 23 U.S.C. § 138.

## IV. NEPA AND THE PREPARATION OF AN ENVIRONMENTAL IMPACT STATEMENT

Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) [5] requires a federal agency to prepare an environmental impact statement (EIS) for every major federal action significantly affecting the quality of the human environment. The FHWA determined not to do an EIS for the proposed Falls Road Bridge and Corridor Project and plaintiff claims this was a violation of the statute.

### A. Standard and Scope of Review

■ The Seventh Circuit has consistently held that an agency's determination that an EIS need not be filed must stand unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *City of West Chicago v. United States Nuclear Regulatory Comm'n.*, 701 F.2d 632, 651 (7th Cir.1983); *Assure Competitive Transportation v. United States*, 635 F.2d 1301, 1308 (7th Cir.1980); *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 229 (7th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). The plaintiff points out that in *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir.1973), the Fifth Circuit applied the less strict rule of reasonableness. In view of the consistent holdings of the Seventh Circuit, however, the Court has no doubt that it must apply the arbitrary and capricious standard in this case. It nevertheless recognizes the admonition of the Supreme Court in *Overton Park* that even under this standard the reviewing court must make a "substantial inquiry" into the facts and that such inquiry must be "searching and careful." 401 U.S. 415–16, 91 S.Ct. at 823.

In determining whether the FHWA's decision was arbitrary and capricious, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). This Court ruled at trial that it

---

**5.** 42 U.S.C. § 4332(2) provides in part:

(C) [I]n ... other major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ...

(i) The environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented

. . . . .

(E) Study, develop and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

. . . . .

would accept evidence beyond the federal administrative record on the Parklands issue but not on the NEPA claim. 3 T 7–8. Accordingly, the Court must determine whether the agency's decision was arbitrary and capricious based on the record before FHWA (Ex. 1000) when it made its finding of no significant impact on November 6, 1981.

Portions of the federal record were highlighted by the parties at trial. The Court subsequent to trial has carefully reviewed the entire 375 page federal record. (Ex. 1000). Having done so, the Court concludes that the FHWA did not act arbitrarily or capriciously, nor did it abuse its discretion in declining to do an environmental impact statement for the project.

It is undisputed that the Falls Road Bridge and Corridor project is a "major" federal action. What is in dispute is whether it may "significantly affect the quality of the human environment" and therefore require the preparation of an EIS. Plaintiff has cited the Court to various sources of authority on the meaning of "significant effect." One of the more helpful was an FHWA regulation which was in effect at the time this project was reviewed by defendants. 23 C.F.R. § 771.10(e) (1980) provides in relevant part as follows:

The following are examples of types of actions which ordinarily have a significant effect on the quality of the human environment:

(1) An action that has more than minimal effect on properties protected under Section 4(f) of the D.O.T. Act ....

.    .    .    .    .

(3) An action that is likely to have a significantly adverse impact on natural, ecological, cultural or scenic resources of national, State or local significance.

(4) An action that ... (ii) causes a significant increase in traffic congestion.

(5) An action which ... (ii) has a significant detrimental impact on air or water quality or on ambient noise levels for adjoining areas....

Basically, the regulation requires that the agency consider those impacts of the project which this Court has already discussed above in connection with the Parklands issue, i.e. traffic, noise, aesthetics, and effect on parkland. As detailed in the Court's discussion of the Parklands issue, there are two sets of traffic projections for this project. One was prepared by Wis. DOT in June of 1979 which projected 4,500 ADT in the year after construction (1981); 7,600 ADT ten years after construction (1991); and 11,200 ADT twenty years after construction. In April of 1983, Wis. DOT revised those figures downward projecting 2,800–3,000 ADT in the year after construction and 4,200 to 4,500 ADT twenty years after construction. The current ADT for South Green Bay Road is 1,200 and for Falls Road, 600. It is clear that when the state and federal agencies made their findings of no significant impact, they were relying on the higher traffic projections. Accordingly, the Court must consider whether the agencies acted arbitrarily in concluding that the project would not cause a significant increase in traffic congestion. Plaintiff makes much of the fact that Wis. DOT decided to adjust the traffic projections downward "after the fact." This alone, however, does not convince the Court that it was unreasonable to find on the basis of the original projections that traffic congestion would not be a significant effect. The Court is mindful that this is not a project which will convert a two-lane street into a 4-lane highway. The Falls Road/South Green Bay Road corridor will remain two lanes and will simply carry an increased volume of traffic. On the record before it, this Court is not prepared to substitute its judgment for that of agency's on what volume of traffic will cause a significant increase in congestion.

On the issue of noise levels, at the time when FHWA made its findings of no significant impact, it was relying on the revised noise analysis. Those revised projections found that noise levels would increase less than 10 decibels over existing levels. The experts testifying at trial agreed that an

increase of less than 10 decibels is not normally considered significant.

On the issue of adverse impact on aesthetic value in the area, it is clear from the record that FHWA considered this matter. Page 27 of the Federal Record notes:

Some trees and brush will be removed where the new corridor is constructed through presently undeveloped lands. Trees will also be removed along the river in the vicinity of the proposed structure. Tree removal will be minimized. Replanting will be considered if immprovements can be made to the aesthetics.

.        .        .        .        .

Residents in the vicinity of the proposed improvements have expressed concern regarding the effect to environmental and aesthetic conditions. Recognizing the aesthetic value of land adjacent to the Milwaukee River, Village officials have indicated that every effort will be made to select a structure type that is visually pleasing and best fits with the existing surroundings.

Again, on the basis of the federal record and the testimony at trial, the Court cannot conclude that FHWA acted arbitrarily or capriciously when it concluded that any adverse impact of the project on the aesthetics of the area would not be significant.

■ Ecological impact is related to aesthetics. The Environment Assessment noted that two species of endangered snakes are known to exist in Ozaukee County and may be present in the proposed corridor. The mere possibility that an endangered species may be present does not appear to this Court to be a significant impact.

On the effect on parkland, it is evident from the Court's discussion in section III *supra* that it concurs in FHWA's belief that Scout Park is not protected parkland. In addition, it is implicit in the Court's discussion of the constructive use of Lime Kiln Park that the Court does not believe that the project will have any substantial impact on the park. Thus the Court cannot disagree with the agency's determination that there will be no "more than minimal effect" on parkland.

Finally, the Court would note that no federal, state, or local government agency has raised objections to the project. The Draft Negative Declaration contained an "A95" review from the Southeastern Wisconsin Regional Planning Commission (SEWRPC) which indicated that the proposed project conformed with the regional transportation plan prepared by SEWRPC. Such an "A95" review by SEWRPC is a clearing house requirement of the Federal Government that regional planning agencies such as SEWRPC review any proposed project that is using federal funds to assure that the project is in conformity with the area wide development plan. SEWRPC, as of December 1982 continued to endorse the Falls Road bridge and corridor project. The Wisconsin Department of Natural Resources reviewed the project and did not object to construction of the Falls Road bridge. The Wisconsin Department of Development endorsed the project.

■ Based on all of the foregoing, the Court would conclude that the proposed project will not significantly affect the quality of the human environment within the meaning of NEPA, and therefore the proposed project does not require the preparation of an Environmental Impact Statement pursuant to NEPA, 42 U.S.C. § 4321, *et seq.* The federal defendants' November 6, 1981, decision that an Environmental Impact Statement was not necessary was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

In conjunction with its assertion that an EIS should have been prepared, plaintiff also asserts that the defendants' failure to assess the impacts within the "logical termini" of the project constitutes a violation of NEPA, specifically 23 C.F.R. § 771.5(a).[6]

---

**6.** 23 C.F.R. § 771.5(a) provides in relevant part as follows:

A highway section should be as long as practicable to permit consideration of environmen-

The Court finds no merit in plaintiff's contention that defendants failed to expand their impact analysis beyond the limits of construction. The Court is satisfied with the record regarding impact on Lime Kiln Park and the noise analysis.

## V. CONSIDERATION OF ALL AVAILABLE ALTERNATIVES AS REQUIRED

■ Plaintiff asserts that defendants have violated the Federal-Aid Highways Act and NEPA and the applicable regulations by failing to consider all available alternatives and all social, economic and environmental effects of the project. In view of the twenty-year history of consideration of alternatives regarding a new bridge, all of which is summarized in the federal record, the Court believes this claim to be without merit. As to plaintiff's assertion that the social, economic and environmental impacts were not sufficiently assessed, the Court believes its decision on the need for an EIS adequately addresses this issue.

The Court concludes that the federal defendants properly and adequately considered potential alternatives to the proposed project as well as potential social, economic and environmental impacts of the proposed project within the meaning of the Federal-Aid Highways Act, 23 U.S.C. § 101 *et seq.* and NEPA, 42 U.S.C. § 4321, *et seq.*

## VI. HEARING REQUIREMENTS OF THE FEDERAL–AID HIGHWAYS ACT

■ Plaintiff's final contention is that defendants have failed to comply with the hearing requirements of the Federal-Aid Highways Act. Initially, plaintiff argued

that there was a dual hearing requirement, i.e. separate location and design hearings. Plaintiff now concedes that pursuant to Wis. DOT's State Action Plan, a single combined hearing is permitted. However, plaintiff still maintains that there has been a violation and that plaintiff is entitled to an additional hearing: (1) because of changed circumstances since the October 6, 1980, meeting and (2) because of procedural irregularities at the October 6, 1980, meeting.

23 C.F.R. Section 795.10(7) provides in relevant part:

To ensure adequate opportunity for public hearing(s) on the need for the proposed project; alternative courses of action; alternative project location and major design features; social, economic, environmental and other effects of the alternative; and the consistency of the project with local planning goals and objectives. The action plan shall include: ... (V) provisions for additional hearing opportunities where there has been ...

(C) change due to an unusually long lapse of time since the last hearing, or

(D) identification of significant, social, economic, or environmental effects not previously considered at earlier hearings.

The relevant sections of the State Action Plan provide:

additional hearing opportunities will be offered under the following circumstance:

3. The identification of significant social, economic or environmental effects not previously considered at an earlier hearing; ... (R–2)

The changes to which plaintiff points include the alteration of the corridor path through Lime Kiln Park, the entire contro-

tal matters on a broad scope and meaningful evaluation of alternatives.... The highway section identified in the EIS or negative declaration should include the total length of highway between logical termini even though only a short length of the total identified highway section is proposed for construction or reconstruction within the multi-year work program. The EIS or negative declaration should clearly identify the length or segment of the total

highway section that is proposed for improvement and furnish any available information concerning long range possibilities for future improvements within the highway section .... For instance, completing a gap in a highway may substantially increase traffic volumes, change traffic patterns or improve access to an area creating a need to include a discussion of impacts relating to the entire highway section.

versy surrounding the Parkland Statute, the revision of the average daily traffic projections, and the possibility that the Chateau Drive railroad crossing may remain open. The Court would first note, as defendants correctly point out, that this particular theory was not raised in the original or amended complaint. Accordingly, the Court need not address it when it is raised for the first time in a post-trial brief. Nevertheless the Court would note that it does not believe that there is a change in the corridor path through Lime Kiln Park. As noted in section III *supra*, the preliminary engineering drawings will not be approved if they take parkland. Similarly, the Parklands issue is not a "change." The Court concluded above that the FHWA made the proper determination regarding the Parklands issue. Defendants can hardly be expected to conduct an additional hearing simply because no Grafton resident attending the October 6, 1980, meeting raised a question regarding parklands. As for the traffic projections and railroad crossing, these are not changes which have occurred because of a significant lapse of time and change of external circumstances. Even if this claim had been raised in a timely fashion, the Court would not find it to have merit.

■ Finally, the Court is not persuaded that any member of the public was denied his or her rights by the alleged "procedural irregularities." The Court does not find a time limit unreasonable in the context of a public meeting where a large number of people must be given an opportunity to speak. In any event, since additional written comments were accepted after the hearing, each person could make as lengthy a comment as he or she chose. As for the missing page, there is nothing in the evidence at trial which suggests that its omission was anything other than a clerical error. The page was later included with the documents filed with Wis. DOT and FHWA. The Court finds no violation of the hearing requirements of Federal-Aid Highways Act, 23 U.S.C. § 128.

In summary, the Court finds no violation of the Parklands Statute, NEPA or the Federal-Aid Highways Act. Accordingly, the complaint against the defendants is hereby DISMISSED.